IN THE CIRCUIT COURT FOR HOWARD COUNTY, MARYLAND

FUTURE FIELD SOLUTIONS, LLC
14550 Burntwoods Road
Glenwood, MD 21738-953l

STEVEN REESE
14550 Burntwoods Road
Glenwood, MD 21738-953l

JAMES C. BRENT, SR.
14550 Burntwoods Road
Glenwood, MD 21738-953l

    and

BRIAN TUNSON
14550 Burntwoods Road
Glenwood, MD 21738-953l

    *Plaintiffs/Counterclaim-Defendants*,

        v.

ERIK VAN NORSTRAND
488 Hawkridge Lane
Sykesville, Maryland 21784,

    *Defendant/Counterclaim-Plaintiff.*

Case No. C-13-CV-22-000581

## **FIRST AMENDED COMPLAINT**

    Plaintiffs FUTURE FIELD SOLUTIONS, LLC, ("FFS" or the "Company"), STEVEN REESE ("Reese"), JAMES C. BRENT, SR. ("Brent"), and BRIAN TUNSON ("Tunson") (collectively, Reese, Brent, and Tunson are the current "Members," and collectively the Company and the current Members are the "Plaintiffs"), by and through counsel, file this First Amended Complaint against Defendant Erik Van Norstrand ("Defendant" or "Van Norstrand"). In support thereof, Plaintiffs state as follows:

1.      Plaintiffs bring this action to confirm the involuntary withdrawal of Defendant from his position as a member of the Company and to recover damages caused by Defendant both before and after he was involuntarily withdrawn. In the alternative, if the Court rules that Defendant has not been withdrawn from the Company and is still a member, the Member Plaintiffs request a judicial dissolution of Future Field Solutions, LLC and ask the Court to appoint an independent Trustee in Liquidation to oversee the Company's dissolution, pursuant to MD. CODE ANN. CORP. AND ASSOC. § 4a-903 (Petition for Judicial Dissolution).

2.      On March 18, 2022, at a duly conducted meeting of the membership of the Company per its operating agreement, at which Defendant was present, the Members, collectively owning 87.5% of the membership interests in the Company, voted to involuntarily withdraw Defendant from membership in the Company. The Members took this action after troubling incidents including Defendant's removal from project leadership by the project customer, repeated disobedience of orders from the controlling members, Defendant's dishonesty with the Members, and alienation of certain key personnel due to Defendant's conduct.

3.      Despite his receipt of notice of the meeting where he was involuntarily withdrawn, as well as his personal attendance at that meeting, and his subsequent acknowledgement of his withdrawal and desire to transition out of the Company, Defendant now asserts that he was never involuntarily withdrawn from the Company.

4.      Defendant has also committed various wrongful acts that have caused, and are continuing to cause, harm to the Plaintiffs.

5.      Accordingly, Plaintiffs seek a declaration from this Court that Defendant was involuntarily withdrawn from the Company at a validly called and conducted meeting of the members of the Company.

6.      Plaintiffs also seek an award of damages sufficient to compensate Plaintiffs for the harm he has caused to the Company and its Members.

## PARTIES AND JURISDICTION

7.      The Company is a limited liability company engaged in certain computer contracting services for agencies of the United States Government tasked with national defense and has its principal office at 14550 Burntwoods Road in Howard County, Maryland.

8.      Reese is a Maryland resident regularly working at 14550 Burtwoods Road and is the majority member and managing member of the Company. Reese owns 51% of the membership interests in the Company.

9.      Brent is a Maryland resident who resides and works at 14550 Burtwoods Road. Brent is a member of the Company. Brent owns 24.5% of the membership interests in the Company.

10.      Tunson is a Maryland resident who regularly works at 14550 Burtwoods Road. Tunson is a member of the Company. Tunson owns 24.5% of the membership interests in the Company.

11.      Defendant is a resident of Carroll County and regularly works in Howard County, Maryland. Defendant formerly was a member of the Company and owned 12.25% of the membership interests in the Company.

12.      This Court has jurisdiction over the Defendants pursuant to Maryland Courts and Judicial Proceedings Code Ann. § 6-102.

13.      Venue for this action in this Court is appropriate pursuant to Maryland Courts and Judicial Proceedings Code Ann. § 6-201.

**FACTS COMMON TO ALL COUNTS**

14.    Reese, Brent, and Van Norstrand formed the Company on July 21, 2020 by filing Articles of Organization with the State of Maryland. Reese, Brent, and Van Norstrand subsequently executed the Operating Agreement of Future Field Solutions dated August 6, 2020 ("Operating Agreement"). *See* **Exhibit A** (Operating Agreement with all current amendments).

15.    Reese and Brent previously worked with Van Norstrand through companies with which each was employed. Though talented at certain aspects of his job, Van Norstrand had previously exhibited volatile tendencies which, to Reese and Brent's knowledge, had led at least one customer to demand Van Norstrand's removal as the technical lead on their project assignment to Van Norstrand's then employer.

16.    Reese and Brent, veteran computer and telecommunications architects and engineers in the programming space who are both older and have more professional experience than Van Norstrand, had hoped that with counselling and development, the younger and less experienced Van Norstrand could develop as a productive and responsible business partner.

17.    Unfortunately, however, serious problems began to develop with Van Norstrand's performance.

18.    Van Norstrand intentionally lied to one of the Company's customers, and frequently lied to his fellow members.

19.    In or about September 2020, the Company started doing business with a federal contractor referred to herein as Company A. Company A was subsequently acquired by another federal contractor. The Vice President of Company A had early meetings with Van Norstrand and advised Van Norstrand that Company A would sponsor the Company for a facility clearance. A facility clearance, commonly referred to as an FCL, is government approval for a commercial company to do classified work with the federal government. The process takes significant effort

from the sponsoring company, the Defense Counterintelligence and Security Agency, and the sponsored company. For months, Van Norstrand had been telling the Members that Company A was working on a facility clearance for the Company.

20.     In truth, Van Norstrand told Company A's Vice President not to sponsor the Company for an FCL. Instead, Van Norstrand suggested that Company A place the Company's employees on independent consultant agreements. Reese, the Company's Facility Security Officer at the time, did not think this arrangement would be compliant. The Company learned that Van Norstrand continued to request that the Company not be sponsored for an FCL even in the weeks leading up to a contract extension awarded on August 2, 2021.

21.     Van Norstrand subsequently admitted to misrepresenting the status of the FCL, not taking required training, that he had not prioritized critical path items, and that not completing those items caused his business partners to lose billable hours.

22.     In addition to his dishonesty with the Members, Van Norstrand engaged in an unauthorized communication with a significant customer jeopardizing that crucial relationship leading Reese to strip Van Norstrand of significant responsibility in the Company.

23.     In or around October 5, 2021, Reese discovered that, despite prior admonitions about having direct customer communications without prior consultation with Brent and Reese, Van Norstrand had engaged an important customer liaison in an unauthorized discussion without consulting either Reese or Brent. On that date, Reese sent Van Norstrand an email regarding that serious and troubling event. Reese wrote that:

> [Brent] requested that you not engage Kunal without talking to me. After talking to Jim, you accepted a call from Kunal to be businesslike and professional but engaged in a conversation regarding the other more serious matters regarding our business relationship which you were specifically told not to do in numerous meetings and resolutions in the company records. You instead were instructed to refer the

[Company A] conversations to me, as we agreed in company meetings.

In that conversation with Kunal, you also intentionally misrepresented a fact to a customer. You told Kunal, a lawyer and the contracts administrator for [Company A] that you were not sure if [FFS] was sponsored for a facility clearance. While we took immediate steps to correct the misrepresentation, it negatively impacts the company. It could be a crime if the statement were made to the government, or in the performance of a government contract, and [FFS] might have a duty to report such conduct to the government.

Shortly after I received Jim's e-mail on Sunday, I spoke with Dave. He brought up that he promised to sponsor [FFS] for a [Facility Clearance License] nearly a year ago, he made it clear that you were the one who suggested that [Company A] not sponsor [FFS] for a facility clearance, including during the contract renewal time. He also indicated that it was your idea to place people on consulting agreements rather than starting the subcontractor agreement.

Jim and I know you have some ups and downs, and that is what led us to delay dealing with the problem. You always seemed to have some reason. However, in this past week, it is quite clear your actions were intentional. We need to take steps to figure out how we can limit risk to our company. We not only should do this, but we are also required to. These steps might involve financial penalties if our members do not comply, or any other sanctions that we can agree upon as members.

24.    As detailed by Reese, Van Norstrand's actions posed very serious risks for the Company.

25.    Van Norstrand had directly departed from the agreed course of action regarding dialogue with this important customer.

26.    Worse still, Reese learned of Van Norstrand's bewildering refusal of the invitation for the Company to be sponsored by another very important customer for an FCL. Sponsorship for an FCL was required by the Company's government client. An FCL would be significantly beneficial for the Company and its ability to obtain valuable work. Van Norstrand's unauthorized conversations and failure to pursue this valuable privilege could have had significant impacts on

the Company and its continued operation. Van Norstrand's actions caused Reese and Brent to question Van Norstrand's reliability as a partner and manager of the Company.

27.    Confronted with the seriousness of his actions, a contrite and chastened Van Norstrand took responsibility for his transgressions, including misrepresenting the status of the Company's quest for an FCL.

28.    In an email dated October 6, 2021, Van Norstrand admitted that he had breached his partners' trust. Van Norstrand agreed that it would be best for him to step away from all customer-facing activities and perform only administrative tasks. Indeed, Van Norstrand agreed that the transitioning of responsibility of important relationships from him to others, including Brent, was beneficial for the Company. Van Norstrand wrote the following in his October 6, 2021 email:

> I assert that our processes and roles have changed greatly over the past four months. From inception until approx. four months ago, I oversaw managing all three of our relationships, and for the most part was given free rein to make decisions with verbal input from the other members, mainly Jim. Over the past four months, we have transitioned the management of the relationship of both the Lockheed and Digiflight relationships from my purview to the joint purview of the other members, Jim, and Steve. Over the past 45 days, we have implemented proper protocols for making decisions in executive meetings, and now have meeting notes. Over the past 15 days, the day-to-day management of the [Company A] relationship has finally transferred from myself to the executive member (Steve).
>
> **I believe that the previously stated changes to both processes and roles that have happened over the past four months have greatly reduced the risks to our company, specifically my lack of experience**. The previously stated changes have also brought us into a better compliance with NIST 800, the DFARs, etc. We are also now documenting our business decisions properly, ensuring that we have written records to refer to, instead of recollections as I have had to do above.
>
> **I fully admit that my training in compliance requirements was non-existent until recently**. Today I successfully passed the Security+ exam and will be starting the FSO certification training this

week. I have a lot of knowledge areas that I am lacking in, but I fully intend to bring myself up to speed posthaste. I have never been required to take a formal ethics training as a contractor, and I believe that such a course would be a benefit not just to me but to everyone in the company.

**Given my lack of experience as well as past failures, I propose that I relinquish all active participation in Prime facing activities until both remaining members, Steve, and Jim, believe I am better prepared to handle the complexities of external corporate relationships**. I will instead focus on completing our benefits transition, assisting in migrating to a DCSA compliant finance system, and any other tasks as assigned during executive meetings.

. . .

**I apologize for the stress, anxiety, and frustration my decisions have caused the both of you**. I wish I had the knowledge that I have now and could have made better decisions regarding our FCL sponsorship with [Company A]. I will fully accept whatever role you both would have me fulfill moving forward, even if that role is purely administrative in function.

(*Emphasis added*.)

29.    Van Norstrand followed this email with a text message sent to Reese and Brent summarizing the situation and offering his proposal for moving forward with his responsibilities substantially curtailed more bluntly:

---

**Erik Van Norstrand**  10/6/2021 12:47 AM (Edited)

A follow up to my super long formal response.

My less formal response is this:

I know I have made mistakes. I know that I am out of my depth in dealing with pretty much everything from this point forward.

Additionally, my family hasn't been a top priority of mine since this entire thing started. A problem made abundantly clear with what's happening with Christine right now.

My proposal is as follows:

1) I will step away from all forward facing corporate roles in totality. These can be split between both Jim and Steve. I've mostly done this already but it'll be a permanent change.

2) I will focus on administrative tasks such as payroll and other tasks as assigned. I will continue on with my assigned contract role as well.

---

> 3) I am going to spend more time with my family, specifically my wife. I've given every available second to this company, and the future that I assumed I could take advantage of is uncertain at best.
>
> Let me know what you both think. As I said in my email, I am willing to take on whatever role you both believe is best for me at this time.

30.     Unfortunately, serious problems with Van Norstrand persisted. Indeed, this culminated with his removal by *another* customer from responsibility over their project.

31.     On February 14, 2022, upon Van Norstrand's return from a two-week family related absence, the Program Manager for the program on which Van Norstrand was working, advised that he was removing Van Norstrand as the Technical Lead of his project. Subsequent discussion with the Program Manager revealed that Van Norstrand was being removed for substandard performance, including poor management of the team, poor architectural design, poor code implementation, and behavior challenges.

32.     On that same day, Reese and Brent had a video meeting with a personnel member of FFS who worked under Van Norstrand. The employee reported that Van Norstrand had advised him that Tunson would be departing FFS and this would be a good development for the employee because the increased responsibility meant that the employee could be paid more money by FFS. This information was not only not in FFS's interests but was also false; Tunson was not leaving FFS. When confronted by Reese and Brent, Van Norstrand was again contrite and acknowledged that he had over-stepped-yet again.

> 2/14/2022 7:11 PM
> You told Ryan too much. You suggested to him Brian was leaving, he would take Bria's spot, and we might pay him more. We have no firm offer for Brian, or contract with LM. That could take months. Ryan is uncomfortable without Brian on the program. This is how rumors get started, and can have bad consequences on what work or rates we get next year.

> Erik Van Norstrand 2/14/2022 7:19 PM
> Understood I apologize. I thought we were set on Brian going to Lockheed so he wasn't working two 40 hour jobs. I don't know Bria is.
>
> Oh you meant Brian

> 2/14/2022 7:19 PM
> Bria with an n.

Erik Van Norstrand 2/14/2022 7:20 PM
Ya I figured that out a bit slow with both my kids sitting on me

I thought we all had an agreed upon order of operations I completely apologize for overstepping

Erik Van Norstrand 2/14/2022 7:29 PM
I was trying to let him know stepping up was going to be rewarded.

I didn't mean to make him uncomfortable.

Man I really screwed up. Damnit.

Replaying it in my head now

> 2/14/2022 7:33 PM
> We have talked to you several times about promises or strong suggestions. That happened with your suggestion (or promise) that we would pay out leave and do it by a certain date. This situation is very similar, and you need to figure out why you are doing it. It harms the company.

33.    Reese and Brent were also alarmed by Van Norstrand's lack of appreciation of the implications of his removal by a customer from lead project responsibility. Instead of seeing the seriousness of this demotion—by a customer no less—and the expression of a lack of confidence in his abilities, Van Norstrand believed this was a positive development as it freed him from leadership. Indeed, Van Norstrand regarded it as nothing more than his own plan of making himself redundant.

Erik Van Norstrand 2/14/2022 9:50 AM
Jim Brent, Brian Tunson, Steve Reese - Great news! Ryan did such a good job backfilling as tech lead the past two weeks, that Larry wanted to know if I would be willing to focus 100% on special projects (my primary non lead tasking) and let Ryan continue as the tech lead. I told him that I had to speak to Ryan first as it was his call. Spoke to Ryan, he was hesitant, but agreed.

My grand plan of backfilling myself has succeeded! Albeit earlier then I planned 😊 I am beyond relieved to be free of the shackled of leadership! 🎉

34.    In a follow-up message from Van Norstrand, he ascribed his unauthorized and imprudent remarks to his subordinate to being overly excited at the prospect of having been removed from leadership by a customer and replaced by that same subordinate. Van Norstrand again agreed to refrain from making unauthorized statements which could compromise the Company.

Erik Van Norstrand 2/14/2022 7:41 PM
You are absolutely right and I see that it in retrospect how I screwed up.

In this case I was excited to be free of the tech lead job.

My goal was to show him that his stepping up wouldn't be forgotten, something that rarely happens in this type of situation.

I was extremely careful not to make any commitments, and ensure it was kept to best effort.

Reality is I shouldn't have said anything. I made an inferred commitment, and that is not a commitment within my scope to make.

My actions were completely out of line and if the members feel there should be a consequence for my misstep I understand

From here on out, I will leave all communications to you with the employees. If a change is requested in the future, it'll go to you first and handled appropriately

All company communications *

2/14/2022 7:46 PM
Ok

35.    Echoing the concerns which led to his removal as Technical Lead by the customer for whose project he was responsible, the Members were advised by a member of Van Norstrand's team of serious criticisms of Van Norstrand's competence:

- technical approach: "Erik has a unique approach to architecting solutions to customer problems. He generally seems to settle on his own interpretation of the problem, design a top-level solution based on that interpretation (and various assumptions about the technologies and systems involved), and then focus solely on that solution without consulting with others, even the apparent experts in the components involved. On those occasions that he does reach out, he appears to mostly be looking for confirmation more than anything else…";

- management style: "Erik's management style on TCP can best be characterized as extremely chaotic and at the same time very controlling. In his position as tech lead, communication with the rest of the team has been simultaneously sparse and unnecessarily noisy, with very little in the way of concrete details being communicated about the overall vision for the program, but endless spam concerning whatever random topic seems to be on his mind. On multiple occasions I have had team members coming to me instead of him asking for concrete details regarding the overall goals of the project and how we intend to execute them, as those details are critical for them to build out their subcomponents to meet the needs of the end product, and they are not having any luck getting those details from Erik. Erik's tendency to stream

- 11 -

thoughts in an unfiltered fashion also causes him to present confusing or inaccurate information during meetings, or in worse cases give the impression of agreeing to scope changes in front of customers";

- customer confidence in his abilities: "I have been made aware of multiple concerns from [Company A] about Erik's behavior on the program, and several deliberate decisions appear to have been made to prevent Erik from derailing the effort"; and

- inability to implement a resolved vision for proceeding which is not his own: "On those occasions where multiple people at multiple levels of the program manage to convince Erik that what he's proposing or pushing for is incorrect, he always seems to find a way to bring it up for debate again."

36.    In sum, Van Norstrand's managerial performance was a disaster. Reese and Brent again had to act to minimize the risks to the Company.

37.    After receiving this serious and alarming report, Reese and Brent felt it best that Van Norstrand not have contact with the complaining employee until the matter could be investigated. Reese repeatedly spoke with Van Norstrand over the next month to consistently advise Van Norstrand to not have contact with the employee and to not interfere with the project which the employee was now leading.

38.    Despite weeks of direction from not only Reese, but also Brent and Tunson, Van Norstrand continued to contact the employee in attempts to "talk" through their differences.

39.    While Van Norstrand felt that these issues were not personal, the employee felt these repeated contacts, in the wake of his disclosures to the Members of his concerns regarding Van Norstrand, were threatening and offensive. The Members were advised by the employee, and also by another of the Company's key personnel, that they would both depart the Company if Van Norstrand remained.

40.    The relationship with Van Norstrand was clearly not working. Faced with the reality of Van Norstrand's failure to succeed in the role to which he had been assigned as a member

of the Company, his acknowledged threats to important customer and employee relationships, the Members unanimously felt that Van Norstrand had demonstrated his incompetence.

41.     Van Norstrand's removal as a member of the Company was the only solution.

42.     Pursuant to Para. 28 of the Operating Agreement, the Members called a meeting on March 18, 2022 to involuntarily withdraw Van Norstrand as a member of the Company.

43.     Van Norstrand was given notice of the meeting and was present.

44.     In Van Norstrand's presence, the Members discussed the reason for the vote and conducted a vote to involuntarily withdraw Van Norstrand from membership in the Company. The vote was unanimous among the Members. Van Norstrand was involuntarily withdrawn.

45.     Thereafter, Van Norstrand acknowledged his removal and worked to facilitate his exit from the Company.

46.     In a text message exchange with Tunson after the vote to withdraw him, Van Norstrand requested that he be removed from administrative access to the Company's systems.

[3/18/2022 5:12 PM] Erik Van Norstrand
do me a favor, suspend my admin account, it's the proper thing to do at this point

[3/18/2022 5:12 PM] Erik Van Norstrand
i don't want even a hint of issues

[3/18/2022 5:24 PM] Brian Tunson
I will not take any action before speaking with Steve and Jim first.

[3/18/2022 5:24 PM] Erik Van Norstrand
of course

[3/18/2022 5:24 PM] Erik Van Norstrand
with their concurrence

47.     On March 21, 2022, Van Norstrand agreed to "stand down from all management tasks" and advised that he was looking to facilitate his exit from the Company.

Erik Van Norstrand 3/21/2022 9:18 PM (Edited)
i haven't received any sort of roles/responsibilities email. Am I safe to assume I am to stand down from all management tasks

> 3/21/2022 9;18 PM
> Yes, you are to stand down from all management activities.

Erik Van Norstrand 3/21/2022 9:19 PM
OK. I am still working out a few more things on my end on what I am looking for to facilitate an exit. When I have everything I will let you know.

48.    Despite this, Van Norstrand now contends that the Members were not permitted to vote to involuntarily withdraw him from the Company.

49.    After the vote to withdraw him, Van Norstrand retained legal counsel who wrongly advised him that the Members were not authorized under the Operating Agreement to vote to involuntarily withdraw Van Norstrand.

50.    Further, Van Norstrand, through his counsel, asserted that the Operating Agreement did not provide any mechanism for removal of a member under the circumstances surrounding Van Norstrand.

51.    After having been directed to the provisions of Paragraphs 28-30 of the Operating Agreement, Van Norstrand, through his counsel, disputed that the circumstances included in those provisions existed.

52.    Since Defendant's involuntary withdrawal from the Company, the Members understand and are informed and therefore believe, that Van Norstrand currently works for another contracting company and is working within the same government agency as FFS.

**ACCESS TO COMPANY PROPERTY AND INFORMATION SYSTEMS**

53.    Defendant has taken actions since March 18, 2022 that have caused significant harm to the Company, for which Defendant is directly responsible.

54.    At the time of his involuntary withdrawal as a member of FFS, Defendant was in, and/or subsequently took, possession of certain property belonging to FFS. That property includes the following items (the "Company Property"):

- Dell G7 17 - 7700 Laptop;

- VisionTek VT2500 USB-C Docking Station;
- ASUS TUF Gaming 2711 2K HDR Gaming Monitor (VG27 AQ);
- Raspberry Pi Touchscreen Monitor;
- CanKit Raspberry Pi 4 8 GB Extreme Kit - 128 GB Edition;
- Raspberry Pi Touchscreen Monitor, Upgraded;
- KVM Switch 4 Ports, HDMI USB Selector;
- Rybozen USB Switch Selector;
- Logitech G533 Wireless Gaming Headset;
- Soundcore Life P3 Noise Cancelling Earbuds;
- Logitech Z407 Bluetooth Computer Speakers;
- Amazon Web Services Account 2012-7647-1770;
- The following domain name accounts (the "Company Domain Name Accounts"):
  - FutureFieldSolutions.com;
  - FFS.io;
  - FutureFieldConsulting.com;
  - FutureFieldConsulting.net;
  - FutureFieldEngineering.com;
  - FutureFieldEngineering.net.

55.     Defendant did not and does not have permission or authorization to possess or control access to any of the Company Property listed above.

56.     The Company, through one or more of its members, acquired the Company's Domain Name Accounts through GoDaddy.

57.     The Company's Domain Name Accounts are the property of the Company.

58.     The Company Domain Name Accounts are essential to Plaintiffs' business. This is especially true for FutureFieldSolutions.com. Defendant's unreasonable and unlawful detention of the Company Domain Name Accounts is wrongful and harmful.

59.     Defendant has stated, in writing, to his fellow Members as recently as February 2022, that "[o ]bviously ffs.io is corporate property as is futurefieldsolutions.com."

60.     Despite this, Defendant has failed and refused to transfer control of the Company Domain Name Accounts to FFS.

61.     Indeed, Defendant has taken affirmative steps to deprive Plaintiffs of control and access to the Company Domain Name Accounts.

62.     Futurefieldsolutions.com is the Company's primary DNS domain name and serves as its Internet identity. It functions as the Internet address of the Company's web site, as well as the address of the Company e-mail communications. This Internet identity of the Company cannot easily be changed, due in large part to the fact that it is used by many other parties, including the U.S. Government, Prime Contractors, vendors, providers, and others.

63.     To satisfy various national security controls imposed by the agencies of the Federal Government for whom FFS does its work, FFS is required to affirm that it exercises sole and full control of its domain name services.

64.     Failure to abide by those requirements can lead to the Company's termination as a contractor and put the Company out of business. In fact, the Federal Government has advised the Company that it risks being terminated if it cannot demonstrate that it controls its own domain names.

65.     And yet, Defendant removed the Members from the Company's Domain Name Registration and Domain Hosting account(s) at GoDaddy in March 2022. This action caused FFS to lose control over the security of its e-mail services and its web site, both of which are required by the Federal Government security controls under which the Company operates.

66.     Thus, Defendant's actions have jeopardized the entire operation of the Company.

67.     On April 4, 2022, Defendant made configuration changes to the Company's GoDaddy account to further alienate the Members from access to the Company Domain Name Accounts. Specifically, Defendant changed the domain name registration e-mail address from the Company email account "erik@futurefieldsolutions.com" account and added two-factor authentication. These changes made it impossible for FFS to access the Company Domain Name Accounts.

68.    Defendant's unlawful and unjustified detention of the Company Property has resulted in damage to Plaintiffs.

69.    The Company has contracts with defense contractors that require compliance with National Institute of Standards and Technology ("NIST") Special Publication (SP) 800-171: *Protecting Controlled Unclassified Information in Nonfederal Systems and Organizations*.

70.    The Company and its information systems, including the laptop wrongfully retained by Defendant, are subject to Defense Federal Acquisition Regulation Supplement 252.204-7012, *Safeguarding Covered Defense Information and Cyber Incident Reporting*.

71.    Denying others access to their information systems is a very serious issue, so much so that on Department of Defense's Standard Form 86 (Questionnaire for National Security Positions), the question is asked, "In the last seven (7) years have you illegally or without proper authorization accessed or attempted to access any information technology system"?

72.    Pursuant to such Federal Government requirements, Plaintiffs have repeatedly asked Defendant to return certain Company-owned equipment and to transfer control of the Company Domain Name Accounts to the Members. Plaintiffs have even offered to enter into a Memorandum of Understanding in which the Company would agree to return to Defendant any domain names if directed by a court to do so, if Defendant would transfer control of the Company's domain names to the Company on a temporary basis, so the Company could affirm its compliance with Federal Government requirements. Defendant refused to do so.

73.    Since March 2022, Defendant has wrongfully denied Plaintiffs sole controlling access to the domain name "futurefieldsolutions.com."

74.    Since March 2022, Defendant has wrongfully denied Plaintiffs sole controlling access to the domain name "ffs.io."

75.    Since March 2022, Defendant has wrongfully denied Plaintiffs sole controlling access to the domain name "FutureFieldConsulting.com."

76.    Since March 2022, Defendant has wrongfully denied Plaintiffs sole controlling access to the domain name "FutureFieldConsulting.net."

77.    Since March 2022, Defendant has wrongfully denied Plaintiffs sole controlling access to the domain name "FutureFieldEngineering.com."

78.    Since March 2022, Defendant has wrongfully denied Plaintiffs sole controlling access to the domain name "FutureFieldEngineering.com."

79.    Since March 2022, Defendant has wrongfully denied Plaintiffs sole access to a Virtual Machine connected to the Active Directory Domain where scripts run for Company management functions.

80.    Since March 2022, Defendant has wrongfully denied Plaintiffs sole access to audit logs for the authentication to the Amazon Web Services account which hosted the Virtual Machine.

81.    Since March 2022, Defendant has wrongfully refused to return Company equipment upon which documents containing Controlled Unclassified Information ("CUI") are stored, including documents labeled "For Official Use Only" ("FOUO").

82.    Since March 2022, Defendant has wrongfully refused to allow the Company to audit the Company's computing equipment that he maintains in his possession and refuses to return. An audit is a contractual requirement even if Defendant were still a member of the Company.

83.    Defendant is, and has been, aware that his refusal to relinquish control of the Company Domain Name Accounts, especially the domain name "futurefieldsolutions.com," has put the Company in jeopardy of losing its government contracts.

84.    Defendant's actions have actually caused the Company to lose some of its government contracts, including a contract with Lockheed Martin, which was cancelled on January 28, 2023 as a direct result of the Company's inability to certify that it exercised sole control over its computing equipment and domain names, due to Defendant's tortious actions.

85.    Defendant's actions may cause FFS to lose other government contracts.

86.    Plaintiffs' damages from Defendant's refusal to return Company assets are still accumulating and are currently believed to be over $1,500,000.00.

## ACCESS TO A COMPANY INSURANCE POLICY

87.    FFS has been and is required to secure and maintain professional liability and business owners insurance policy.

88.    FFS decided to obtain such a policy in early 2022 from Hiscox, to be paid with company funds.

89.    Defendant was tasked to ensure that the Hiscox insurance policy was obtained. As a result, Defendant obtained the selected Hiscox policy for FFS.

90.    After his separation from the Company, however, Defendant wrongfully took actions to deny Plaintiffs their rightful access and use of the Hiscox policy. Specifically, Defendant intentionally changed the official contact email associated with the Hiscox policy to his personally controlled email account.

91.    This act by Defendant was a direct violation of the Company's security policy and it was an intentional interference in the Company's business.

92.    As a result of Defendant's actions, Hiscox refused to grant any Member access to the policy until the person who originally purchased the insurance on behalf of the Company (*i.e.*, Defendant) answered an email confirming access was appropriate. Defendant refused to do so.

93.     Defendant's actions immediately jeopardized the Company's ability to do business with Prime Contractors, as the inability to access the policies made the Company non-compliant with government requirements.

94.     Defendant's actions and failures to act collectively set up a chain of events requiring FFS and the Members to purchase a new policy in order to become compliant with government requirements.

95.     The damages from Defendants actions regarding the Hiscox policy are at least: $7,845.67.

## COUNT I
**(Declaratory Judgment Under Md. Code Ann., Courts & Jud. Proc. Art. § 3-406.)**

96.     Plaintiffs incorporate in this Count all the allegations made in Paragraphs 1-95 of this Complaint, as if fully set forth herein.

97.     An actual controversy exists between and among Plaintiffs and Van Norstrand as to the Operating Agreement, as amended, and the ability of the Members to vote to involuntarily withdraw Van Norstrand from membership in the Company, and the vote to involuntarily withdraw Van Norstrand from membership in the Company.

98.     Plaintiffs contend that the Operating Agreement provides that the Members are able to vote to involuntarily withdraw a member from the Company on the grounds of incompetence. The Plaintiffs further contend that Members did validly conduct a vote to involuntarily withdraw Van Norstrand from membership in the Company. Plaintiffs further contend that they were justified in seeking to involuntarily withdraw Van Norstrand from membership in the Company on the grounds of his incompetence.

99.     Van Norstrand contends that he was not involuntarily withdrawn from membership in the Company and that he continues to be entitled to all of the benefits and rights to which a member in the Company is entitled. Plaintiffs dispute this baseless contention by Van Norstrand.

100.    Antagonistic claims exist between and among the parties which indicate and have resulted in imminent and inevitable litigation.

101.    Therefore, a controversy between and among the parties exists which entitles the Plaintiffs to this Court's declaratory judgment under MD. CODE ANN., COURTS & JUD. PROC. ART. § 3-406.

102.    This Court's declaratory judgment concerning the parties' rights and interests will terminate this Controversy.

**COUNT II**
**(Judicial Dissolution.)**

103.    Plaintiffs incorporate in this Count all the allegations made in Paragraphs 1-102 of this Complaint, as if fully set forth herein.

104.    Although a judicial dissolution is **<u>not</u>** Plaintiffs' preferred course of action, if the Court rules that Defendant has <u>not</u> been withdrawn from the Company and is <u>still</u> a member, the Member Plaintiffs seek a judicial dissolution of the Company because they believe it is not reasonably practicable to carry on the business of the Company in view of Defendant's multiple violations of the Operating Agreement and his continued interference with the Company's business, especially Defendant's misappropriation and conversion of Company Property. In short, the Member Plaintiffs cannot do business with Defendant Van Norstrand. Therefore, if the Court rules that Van Norstrand is still a member of the Company, the Member Plaintiffs hereby apply for dissolution of Future Field Solutions, LLC under MD. CODE ANN. CORP. AND ASSOC. § 4a-903 (Petition for Judicial Dissolution).

105.    "On application by or on behalf of a member, the circuit court of the county in which the principal office of the limited liability company is located may decree the dissolution of the limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or the operating agreement." *Id*.

106.    Here, if the Defendant must be a member of the Company by order of the Court, Plaintiffs assert that it is not reasonably practicable to carry on the business of the Company in conformity with the Operating Agreement given Defendant's multiple violations of the Operating Agreement, Defendant's refusal to return Company Property, and Defendant's repeated interference with the Company's business. Defendant certainly cannot be trusted to effectuate and complete the dissolution of the Company, in light of his improper conduct summarized throughout this First Amended Complaint.

## COUNT III
### (Intentional Interference with a Contractual Relationship.)

107.    Plaintiffs incorporate in this Count all the allegations made in Paragraphs 1-106 of this Complaint, as if fully set forth herein.

108.    The Company, through one or more of its members, acquired the Company's Domain Name Accounts through GoDaddy.

109.    The Company's Domain Name Accounts are the property of the Company.

110.    Defendant removed the Members from the Company's Domain Name Registration and Domain Hosting account(s) at GoDaddy in March 2022. This action caused FFS to lose control over the security of its e-mail services and its web site, both of which are required by the Federal Government security controls under which the Company operates.

111.    Thus, Defendant's actions have jeopardized the entire operation of the Company.

112.    On April 4, 2022, Defendant made configuration changes to the Company's GoDaddy account to further alienate the Members from access to the Company Domain Name Accounts. Specifically, Defendant changed the domain name registration e-mail address from the Company email account "erik@futurefieldsolutions.com" account and added two-factor authentication. These changes made it impossible for FFS to control access the Company Domain Name Accounts.

113.    Until January 2023, the Company had a contract with Lockheed Martin.

114.    Representatives from Lockheed Martin repeatedly informed Plaintiffs that the Company must affirm that it exercises sole and full control of its domain name services in order to maintain its contract with Lockheed Martin.

115.    Defendant was informed of this requirement.

116.    Defendant was given an opportunity in January 2023 to enter into a Memorandum of Understanding in which the Company would agree to return to Defendant any domain names if directed by a court to do so, if Defendant would transfer control of the Company's domain names to the Company on a temporary basis, so the Company could affirm its compliance with Federal Government requirements.

117.    Defendant refused to enter into the Memorandum of Understanding.

118.    Defendant's refusal was the direct cause of the Company losing its contract with Lockheed Martin and may be the direct cause of the Company losing other contracts as well.

119.    On information and belief, Defendant's refusal was calculated to cause damage to the Plaintiffs in their lawful business and with the unlawful purpose to cause such damage and loss, without any justifiable right or cause and/or to make the contract with Lockheed Martin impossible to perform.

120.    Defendant's refusal constitutes maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. *See K & K Management, Inc. v. Lee*, 557 A.2d 965, 973 (Md. 1989) (quoting *Natural Design, Inc. v. Rouse Co.*, 485 A.2d 663, 674 (Md. 1984)); *see also Kaser v. Fin. Prot. Mktg., Inc.*, 376 Md. 621, 628 (2003).

121.    The harm to Plaintiffs from Van Norstrand's intentional interference with the Company's contract with Lockheed Martin and other contracts exceeds $1,545,810.00 in value.

**COUNT IV**
**(Intentional Interference with a Business Relationship.)**

122.    Plaintiffs incorporate in this Count all the allegations made in Paragraphs 1-121 of this Complaint, as if fully set forth herein.

123.    The Company, through one or more of its members, acquired the Company's Domain Name Accounts through GoDaddy.

124.    The Company's Domain Name Accounts are the property of the Company.

125.    Defendant removed the Members from the Company's Domain Name Registration and Domain Hosting account(s) at GoDaddy in March 2022. This action caused FFS to lose control over the security of its e-mail services and its web site, both of which are required by the Federal Government security controls under which the Company operates.

126.    Thus, Defendant's actions jeopardized the entire operation of the Company and was calculated to cause damage to Plaintiffs in their lawful business.

127.    On April 4, 2022, Defendant made configuration changes to the Company's GoDaddy account to further alienate the Members from access to the Company Domain Name Accounts. Specifically, Defendant changed the domain name registration e-mail address from the Company email account "erik@futurefieldsolutions.com" account and added two-factor

authentication. These changes made it impossible for FFS to control access the Company Domain Name Accounts.

128.    Defendant's actions were intention and willful, and were calculated to cause damage to the Plaintiffs in their lawful business;

129.    Defendant's actions made it difficult, if not impossible, for FFS to control access to the Company Domain Name Accounts, which in turn, made it impossible to maintain control over, or to secure, the Company's website and/or its email system and other communications systems. Because a company's primary presence on the Internet is its website, Defendant's blocking of the Members' ability to access the Company Domain Name Accounts have effectively caused an extinction event for the Company, preventing it from making controlled changes to the Company website and therefore preventing from advancing future business goals on the Internet.

130.    Accordingly, Defendant has intentionally interfered with Plaintiffs' business relationship with the Internet domain name registrar GoDaddy. *See Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994) (setting forth the requirements for intentional interference with a business relationship).

131.    The harm to Plaintiffs from Van Norstrand's intentional interference with Plaintiffs' business relationship with the Internet domain name registrar GoDaddy exceeds $1,091,160.00 in value.

## COUNT V
### (Violation of the Federal Computer Fraud and Abuse Act.)

132.    Plaintiffs incorporate in this Count all the allegations made in Paragraphs 1-131 of this Complaint, as if fully set forth herein.

133.    Van Norstrand has violated the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by accessing, interfering with, and blocking, without permission or authorization,

Plaintiffs' right to exercise sole access to the Company's domain name "futurefieldsolutions.com."
Van Norstrand took these unauthorized actions after he had been involuntarily withdrawn and
removed from the company and therefore during a period when he was not authorized to access
any of the Company Domain Name Accounts, including the Company's primary domain name
"futurefieldsolutions.com."

134.    Van Norstrand's violation of the Computer Fraud and Abuse Act directly caused
the Company to lose its contract with Lockheed Martin and made it impossible for the Company
to maintain control over, or to secure, the Company's website and/or its email and other
communications systems.

135.    The harm to Plaintiffs from Van Norstrand's violation of the federal Computer
Fraud and Abuse Act exceeds $1,500,000.00 in value.

WHEREFORE, the Plaintiffs request that this Court enter a judgment, declaring, decreeing,
and adjudging the rights of the parties as follows:

A.    Issuing a judgment affirming the ability of the Members to vote to involuntarily
withdraw a member from the Company for incompetence;

B.    Issuing a judgment affirming the Members' vote on or about March 18, 2022 to
involuntarily withdraw Van Norstrand from membership in the Company;

C.    Issuing a judgment affirming the Van Norstrand's status as not being a member of
the Company as of March 18, 2022;

D.    In the alternative to requests (A) through (C) above, issuing an order dissolving
Future Field Solutions, LLC.

D.    Issuing a judgment in Plaintiffs' favor and against Van Norstrand for violation of
the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

F.    Issuing a judgment in Plaintiffs' favor and against Van Norstrand for intentionally interfering with the Company's contract with Lockheed Martin.

G.    Issuing a judgment in Plaintiffs' favor and against Van Norstrand for intentionally interfering with Plaintiffs' business relationship with Godaddy

H.    Awarding Plaintiffs direct and consequential damages in amounts to be proven at trial as to each cause of action, totaling at least $1,500,000.00.

I.    Such other and further relief as the Court deems just and equitable.

Respectfully submitted,


Date: April 10, 2023                                 */s/ Seth C. Berenzweig*

Seth C. Berenzweig, Esq. (Atty No: 9801120001)
  sberenzweig@berenzweiglaw.com
Clyde E. Findley, Esq. (VSB No. 48277)
  cfindley@berenzweiglaw.com
BERENZWEIG LEONARD, LLP
8300 Greensboro Drive, Suite 1250
McLean, Virginia 22102
(703) 760-0402 (telephone)
(703) 462-8674 (facsimile)

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of April 2023, a copy of the foregoing was

served via the Court's MDEC System and/or mail, postage prepaid, on the following individual(s).

Glenn C. Etelson, Esq.
  getelson@shulmanrogers.com
Lane Hornfeck, Esq.
  lhornfeck@shulmanrogers.com
12505 Park Potomac Avenue, 6th Floor
Potomac, MD 20854
(301) 230-5200 (telephone)
(301) 230-2891 (facsimile)

*Counsel for Erik Von Norstrand*

                                        */s/ Clyde E. Findley*
                                        Clyde E. Findley
                                          cfindley@berenzweiglaw.com
                                        BERENZWEIG LEONARD LLP
                                        8300 Greensboro Drive, Suite 1250
                                        McLean, VA 22102
                                        Telephone: (703) 760-0402
                                        Facsimile: (703) 462-8674