```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND

                                        :
FUTURE FIELD SOLUTIONS, LLC,
et al.                                  :

     v.                                 :   Civil Action No. DKC 23-1301

                                        :
ERIK VAN NORSTRAND
                                        :
```

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case involving a limited liability company ("LLC") membership withdrawal dispute are: (1) a motion for partial summary judgment filed by Plaintiffs Future Field Solutions, LLC ("Future Field"), Steven Reese ("Mr. Reese"), James C. Brent, Sr. ("Mr. Brent"), and Brian Tunson ("Mr. Tunson") (collectively, "Plaintiffs"), (ECF No. 55); (2) a motion for partial summary judgment filed by Defendant Erik Van Norstrand ("Defendant"), (ECF No. 107); (3) a motion to file certain attachments and exhibits in support of a motion for partial summary judgment under seal filed by Defendant, (ECF No. 118); (4) a motion to seal certain documents filed with Plaintiffs' response in opposition to Defendant's motion for partial summary judgment filed by Plaintiffs, (ECF No. 126); (5) a motion to file a reply to Plaintiffs' opposition to Defendant's motion for partial summary judgment and accompanying exhibit under seal filed by Defendant, (ECF No. 128); (6) a motion to file an exhibit to a

reply in support of a motion for preliminary injunction under seal by Defendant, (ECF No. 136); and (7) a joint motion to dismiss Defendant's second amended counterclaim and third-party complaint filed by Plaintiffs and Third-Party Defendant PeriArchon, LLC ("PeriArchon"), (ECF No. 137). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiffs' motion for partial summary judgment will be denied; Defendant's motion for partial summary judgment will be granted in part and denied in part; the motions to seal will be denied; and the joint motion to dismiss Defendant's second amended counterclaim and third-party complaint will be denied.

I.    **Background**

The following facts are undisputed unless otherwise noted. Future Field is a government contracting company providing computer services for national defense agencies that ceased doing business near the end of 2022. (ECF Nos. 55-2, at 25; 121-2, at 37, 66). Future Field's principal office is located in Sykesville, Maryland in Howard County. (ECF Nos. 55-2, at 5; 111-1, at 59). Two prior iterations of Future Field were formed in 2011 and 2012. (ECF Nos. 111-1, at 14; 121-2, at 4-7, 9-12).

A. **Defendant's Involuntary Withdrawal**

At a members' meeting in mid-March 2022 (the "Meeting"), Mr. Reese, Mr. Brent, and Mr. Tunson (collectively, the "Individual

2

Plaintiffs"), members of the current iteration of Future Field, withdrew Defendant involuntarily as a member of the company on the basis of "incompetence," pursuant to Future Field's operating agreement (the "Operating Agreement"). (ECF Nos. 55-2, at 37; 121-2, at 49, 80-81; 111-1, at 36; 112-1, at 9). Mr. Reese contends that Defendant was incompetent because he "fail[ed] to understand and adhere to standard business and financial accounting practices[]" as well as "federal contracting rules, regulations, and laws"—"to the point of creating severe liabilities to [Future Field and] its members, customers, and employees." (ECF Nos. 55-2, at 25; 121-2, at 37; *see also* ECF Nos. 111-1, at 37, 52-53). Plaintiffs did not seek a judicial determination prior to effectuating Defendant's involuntary withdrawal. (ECF No. 111-1, at 33, 50)

The Individual Plaintiffs then executed an amendment on March 22, 2022 to Future Field's Operating Agreement memorializing Defendant's removal and reallocating membership interests amongst Individual Plaintiffs (the "Amendment"). (ECF Nos. 55-2, at 20, 84; 111-1, at 74; 107-10, at 2). Prior to Defendant's involuntary withdrawal, Defendant possessed a 12.25% ownership interest, Mr. Brent possessed a 24.5% ownership interest, Mr. Reese possessed a 51% ownership interest, and Mr. Tunson possessed a 12.25% ownership interest. (ECF Nos. 55-2, at 18; 111-1, at 72).

**B. The Google Account, GoDaddy Account, Amazon Web Services Account, and Domain Names[1]**

Defendant acquired the futurefieldsolutions.com domain name (the "GoDaddy Domain Name") in association with the first iteration of Future Field.  (ECF No. 121-2, at 17; *see also* ECF No. 107-6, at 2-3).  The GoDaddy Domain Name was used by all iterations of Future Field. (*See* ECF No. 121-2, at 17, 74; 123, at 2).  Beginning in 2015, Defendant started an account (the "GoDaddy Account") with the GoDaddy Operating Company, LLC ("GoDaddy") to host the GoDaddy Domain Name.  (ECF No. 107-16, at 2; *see also* ECF No. 115-1, at 8).

Defendant created a Google account in association with the futurefieldsolutions.com domain name (the "Google Account").  (ECF Nos. 107-3, at 3; 121-2, at 82).  Defendant used the Google Account to store personal information in addition to creating subsidiary accounts for Mr. Reese and Mr. Brent to use in conducting business on behalf of Future Field.  (ECF Nos. 107-3, at 3-4; 121-2, at 82).  The Google Account was configured to allow its users access to all the documents stored within it.  (ECF No. 45-3 ¶ 16).

Defendant initially created the Amazon Web Service Account No. 201276471770 (the "AWS Account") before the current iteration

---

[1] "A domain name is the 'address' at which a computer user accesses a website on the internet." *Harrods Ltd. V. Sixty Internet Domain Names*, 302 F.3d 214, 221 (4th Cir. 2002). It is different from an "account" at an internet service provider that hosts the website or provides other services.

of Future Field was formed.  (ECF Nos. 115-1, at 15; 54, at 40).
The AWS Account was used by Future Field to host domain
registration information.  (ECF Nos. 115-1, at 15; 54, at 40).

After Defendant's involuntary removal from Future Field,
Plaintiffs removed Defendant's access to the Google Account, (ECF
No. 121-2, at 83; 112-1, at 13), whereas Defendant removed
Individual Plaintiffs' access to the AWS account, (ECF No. 121-2,
at 70, 74), and the GoDaddy Domain Name, (ECF Nos. 121-2, at 74;
*see also* ECF No. 34-1, at 198-202).

### C. Procedural History

Plaintiffs commenced this action by filing a complaint in the
Circuit Court for Howard County (the "Circuit Court"), (ECF No.
5), and Defendant timely removed to this court on May 17, 2023,
(ECF No. 1). On June 28, 2023, Plaintiffs filed a second amended
complaint (the "Complaint") advancing the following claims: (1)
requesting declaratory judgment that Defendant has been
involuntarily withdrawn from Future Field (Count I); (2) judicial
dissolution (Count II); (3) intentional interference with a
contractual relationship (Count III); (4) intentional interference
with a business relationship (Count IV); (5) violation of the
Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 (Count V);
(6) declaratory judgment of ownership of company property (Count
VI).  (ECF No. 34).

On December 27, 2023, the court granted Defendant leave to file a second amended counterclaim and third-party complaint (the "Counterclaim"), (ECF Nos. 131; 132), which advances the following counterclaims: (1) requesting declaratory judgment that Defendant was improperly removed from Future Field, the Amendment is improper and unenforceable, and PeriArchon is Future Field's alter ego (Count I); (2) breach of contract (Count II); (3) breach of duty of loyalty (Count III); (4) breach of fiduciary duty (Count IV); (5) violation of the Maryland Wage Payment and Collection Law (Count V); (6) request for accounting (Count VI); (7) wrongful termination (Count VII); (8) indemnification (Count VIII); (9) gross negligence and/or willful misconduct (Count IX); (10) violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.* (Count X); (11) violation of the CFAA, 18 U.S.C. § 1030 *et seq.* (Count XI); (12) conversion (Count XII); (13) invasion of privacy (Count XIII); (14) defamation (Count XIV); (15) fraud (Count XV); (16) tortious interference with contracts and business expectancies (Count XVI); (17) civil conspiracy (Count XVII); (18) requesting injunctive relief (Count XVIII). (ECF No. 133).  On October 20, 2023, the parties stipulated to the dismissal of Counts XIV and XVI of the Counterclaim.  (ECF No. 86).

On September 1, 2023, Plaintiffs filed a motion for partial summary judgment on Count I of the Complaint and Count I of the

6

Counterclaim.[2]  (ECF No. 55).  On September 15, 2023, Defendant opposed.  (ECF No. 67).  On October 10, 2023, Defendant filed a supplemental opposition.  (ECF No. 80).  On October 24, 2023, Plaintiffs replied.  (ECF No. 90).  On November 20, 2023, Defendant filed a motion for partial summary judgment on Counts I, II, III, IV, V, and VI of the Complaint as well as Counts I, II, III, IV, X, XII, XIII, and XVIII of the Counterclaim.  (ECF No. 107).  On December 4, 2023, Plaintiffs opposed.  (ECF No. 121).  On December 18, 2023, Defendant replied.  (ECF No. 127).  On November 21, 2023, Defendant filed a motion to file under seal certain papers filed in support of his motion for partial summary judgment.  (ECF No. 118).  On December 4, 2023, Plaintiffs filed a motion to file under seal  certain  papers  filed  in  support  of  their  opposition  to Defendant's motion for partial summary judgment.  (ECF No. 126). On December 18, 2023, Defendant filed a motion to file under seal his reply in support of his motion for partial summary judgment and its corresponding exhibit.  (ECF No. 128).  On January 10, 2024, Defendant filed a motion to file under seal Exhibit 1 to his reply in support of his Motion for Preliminary Injunction.  (ECF No. 136).

---

[2] Plaintiffs also moved for summary judgment on Count XIV of the Counterclaim, (ECF No. 55), which was withdrawn after the parties stipulated to dismiss that count, (ECF No. 90, at 4) (citing ECF No. 86).

## II.  Motions to Seal

Both parties have filed unopposed motions to seal.  (ECF Nos. 118; 126; 128; 136).  The United States Court of Appeals for the Fourth Circuit has reminded us that:

> It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings.  *See  Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *Media Gen. Operations, Inc. v. Buchanan*, 417 F.3d 424, 428 (4th Cir. 2005). The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny.  *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004).  "The distinction between the rights of access afforded by the common law and the First Amendment is significant, because the common law does not afford as much substantive protection to the interests of the press and the public as does the First Amendment."  *In re United States for an Order Pursuant to 18 U.S.C. Section 2703*, 707 F.3d 283, 290 (4th Cir. 2013) (quoting *Va. Dep't of State Police*, 386 F.3d at 575) (internal quotation marks omitted).  The common-law presumptive right of access extends to all judicial documents and records, and the presumption can be rebutted only by showing that "countervailing interests heavily outweigh the public interests in access."  *Rushford* [*v. New Yorker Mag., Inc.*], 846 F.2d [249,] 253 [(4th Cir. 1998)].  By contrast, the First Amendment secures a right of access "only to particular judicial records and documents," *Stone* [*v. Univ. of Marland Med. Sys. Corp.*], 855 F.2d [178,] 180 [(4th Cir. 1998)], and, when it applies, access may be restricted only if closure is "necessitated by a compelling government interest" and the denial of access is "narrowly tailored to

> serve that interest," *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510 (1984) (internal quotation marks omitted)).

*Doe v. Pub. Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014); *see also United States ex rel. Oberg v. Nelnet, Inc.*, 105 F.4th 161, 171 (4th Cir. 2024).  The Fourth Circuit also explained that:

> When presented with a motion to seal, the law in this Circuit requires a judicial officer to comply with the following procedural requirements:  (1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; (2) consider less drastic alternatives to closure; and (3) if it determines that full access is not necessary, it must state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives.

*Doe*, 749 F.3d at 272 (citing *In re Knight Pub. Co.*, 743 F.2d 231, 234-35 (4th Cir. 1984)); *see also Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000).  According to Local Rule 105.11, the party seeking sealing must include "(a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection."

Even where, as here, the parties have agreed to a pretrial discovery protective order,[3] the Fourth Circuit has ruled that

---

[3] On March 6, 2023, the Circuit Court entered a stipulated protective order for handling discovery, as agreed upon by both parties.  (ECF No. 46 ¶ 5).  On August 10, 2023, Defendant filed

"once the documents [are] made part of a dispositive motion [such as one for summary judgment], they los[e] their status as being 'raw fruits of discovery,' and that discovery, 'which is ordinarily conducted in private, stands on a wholly different footing than does a motion filed by a party seeking action by the court.'" *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 576 (4th Cir. 2004) (quoting *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 252 (4th Cir. 1988)).   "Characterizing documents as 'confidential' without any description of what information they contain or why that information should be protected does not satisfy the 'specific factual representations' that Local Rule 105.11 requires."   *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F.Supp.2d 399, 438 (D.Md. 2006); *see also Butler v. DirectSAT USA, LLC*, 55 F.Supp.3d 793, 820 (D.Md. 2014) ("Reliance on a boilerplate confidentiality order with no attempt to redact portions of the filings, however, is insufficient for a motion to seal, especially where it is connected with a motion for summary judgment.").   "District courts must review the merits of motions to seal 'and not merely allow continued effect to a pretrial discovery protective order,' because '[t]he reasons for granting a protective order to facilitate pre-trial discovery may or may

---

a consent motion to accept the stipulated protective order, (ECF No. 46), which was approved by Magistrate Judge Coulson on August 11, 2023, (ECF No. 47).

not be sufficient to justify proscribing the First Amendment right of access to judicial documents.'" *Smith v. Integral Consulting Servs., Inc.*, No. 14-cv-3094-DKC, 2016 WL 4492708, at *16 (D.Md. Aug. 26, 2016) (quoting *Washington Post*, 386 F.3d at 576).

Defendant seeks to seal his statement of undisputed material facts, (ECF No. 108), his memorandum in support of his motion for partial summary judgment, (ECF No. 109), as well as Exhibits 2, 3, 7, 9, 11, 12, and 13 to his motion for partial summary judgment. (ECF No. 118 ¶¶ 6-13).  These exhibits include: a sworn declaration by Defendant, (ECF No. 110); Defendant's supplemental opposition to Plaintiffs' motion for partial summary judgment, (ECF No. 111); excerpts from Mr. Reese's deposition transcript, (ECF No. 112); email correspondence between Future Field's employees discussing the award of Future Field's Top-Secret Level Facilities Clearance License, (ECF No. 113); excerpts from Mr. Brent's deposition transcript, (ECF No. 114); the report and supplemental report by Plaintiffs' expert Dr. Eric Cole ("Dr. Cole"), (ECF No. 115); email correspondence between Future Field's employees discussing work that needs to be performed on certain government contracts, (ECF No. 116).  Defendant also seeks to seal his reply in support of his motion for partial summary judgment, (ECF No. 129), and its corresponding exhibit containing excerpts from Mr. Reese's deposition transcript, (ECF No. 129-1).  (ECF No. 128).  The only justification Defendant provides for the sealing of these papers

11

is that they "summarize[], describe[], and disclose[] [c]onfidential [d]iscovery [m]aterial[]" pursuant to the protective order. (ECF Nos. 118 ¶¶ 6-13; 128 ¶ 6).

Moreover, Defendant also seeks to seal Exhibit 1 to his reply in support of his motion for preliminary injunction, (ECF No. 54), a report by Defendant's expert Joseph Steinberg ("Mr. Steinberg"). (ECF No. 136).[4]  The only justification Defendant provides for the sealing of this exhibit is that it "is marked 'Confidential' pursuant to the Stipulated Protective Order" and contains "confidential, personal, and proprietary information" throughout its entirety. (ECF No. 136 ¶¶ 7-8).

Plaintiffs seek to seal their response to Defendant's statement of undisputed material facts, (ECF No. 122), as well as Exhibits 5, 9, and 18 to their opposition to Defendant's motion for partial summary judgment. (ECF No. 126 ¶¶ 6-9).  Exhibit 5 consists of excerpts from Mr. Brent's deposition transcript. (ECF No. 123).  Exhibit 9 consists of a copy of Future Field's accounts receivables. (ECF No. 124).  Exhibit 18 consists of Future Field's member meeting minutes dated February 25, 2022.  (ECF No. 125).

---

[4] Defendant also filed his opposition and supplemental opposition to Plaintiffs' motion for summary judgment under seal. (ECF Nos. 68; 80).  Sealing of court records is not automatic. Pursuant to Local Rule 105.11, a properly supported motion to seal is required for these sealed papers.  If Defendant fails to file a motion to seal comporting with Local Rule 105.11 within fourteen days of this memorandum opinion and order, these papers will be ordered unsealed at that time.

The only justification Plaintiffs provide for the sealing of these papers is that they "summarize[], describe[], and disclose[] [c]onfidential [d]iscovery [m]aterial[]" pursuant to the protective order in addition to "contain[ing] and refer[ring] to government protected contract information." (ECF No. 126 ¶¶ 6-9).

Both parties rely on boilerplate recitations referencing the protective order in their motions to seal without specific factual representations to justify the sealing. Nor have the parties made any effort to redact portions of the filings as opposed to sealing the documents in their entirety. The parties' blanket references to a protective order and generic labels of government-protected or confidential, personal, and proprietary information are insufficient to support their motions to seal. Accordingly, the motions to seal will be denied.[5] *See Visual Mining, Inc. v. Ziegler*, No. 12-cv-3227-PWG, 2014 WL 690905, at *5 (D.Md. Feb. 21, 2014) (denying motion to seal when the only justification was that the documents are "confidential" under a court-approved protective order); *Under Armour, Inc. v. Body Armor Nutrition, LLC*, No. 12-cv-1283-JKB, 2013 WL 5375444, at *9 (D.Md. Aug. 23, 2013) (denying

---

[5] The parties have fourteen days to renew their motions to seal with memoranda that comply with Local Rule 105.11. In the meantime, the papers that the parties seek to seal will remain temporarily under seal. If the parties do not renew their motions to seal, these papers will be unsealed.

motions to seal where "[t]he parties . . . provided only the barest support for the motions, usually relying on the protective order issued in th[e] case" and failed to "provide 'specific factual representations' to justify their argument"); *Butler v. DirectSAT USA, LLC*, 876 F.Supp.2d 560, 577 n.18 (D.Md. 2012) ("In their motion to seal, Plaintiffs state only that they seek to seal the exhibits pursuant to the confidentiality order, an explanation insufficient to satisfy the 'specific factual representations' that Local Rule 105.11 requires.").

## III. Motions for Partial Summary Judgment[6]

### A. Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any

---

[6] Although the parties filed their respective motions for partial summary judgment before the court granted leave for Defendant to file the latest amended Counterclaim, the motions for partial summary judgment are not mooted by the Counterclaim. *See Buechler v. Your Wine & Spirit Shoppe, Inc.*, 846 F.Supp.2d 406, 414 (D.Md.), *aff'd*, 479 F.App'x 497 (4th Cir. 2012) (citing *Young v. City of Mt. Ranier*, 238 F.3d 567, 572 (4th Cir. 2001)) (stating that while "an amended pleading ordinarily supersedes an earlier pleading and renders it of no further legal effect[,]" the defendant's motion for summary judgment was not mooted by the Plaintiff's later-filed amended complaint "because such a motion is not directed at the adequacy of a complaint's allegations but is instead focused on the merits of the substantive claim"). Courts in this district treat a motion for summary judgment as applying to a later-filed amended complaint to the extent that the amended complaint repeats the same claims as the prior complaint. *See, e.g., Tawwaab v. Virginia Linen Serv., Inc.*, 729 F.Supp.2d 757, 771 n.5 (D.Md. 2010) ("Defendants move for summary judgment on the claims contained in the Second Amended Complaint. As the Court has granted Plaintiffs' Motion for Leave to File a Third

material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.   In *Anderson v. Liberty Lobby, Incorporated*, 477 U.S. 242, 249 (1986), the Supreme Court of the United States explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."   *Id.* at 252.

    In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most

---

Amended Complaint, it will treat Defendants' Motion for Summary Judgment as applying to the Third Amended Complaint to the extent that it repeats the same claims as those of the Second Amended Complaint."); *Bell v. CSX Transportation, Inc.*, No. 18-cv-00744-JKB, 2024 WL 2055250, at *1 n.1 (D.Md. May 8, 2024) ("Although the instant Motion for Summary Judgment was filed before the filing of the operative First Amended Complaint, the Court expressly informed the parties that it would consider this Motion ripe upon the filing of the First Amended Complaint, because the new Complaint only added new Plaintiffs and did not otherwise broaden the scope of the allegations[.]").   Accordingly, the court construes the parties' motions for partial summary judgment as applying to the Counterclaim with respect to the claims involving Plaintiffs but not the claims involving PeriArchon—which were newly introduced in the latest amended Counterclaim.   (*See* ECF No. 39-2) (redline of latest amended Counterclaim).

15

favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *See Liberty Lobby*, 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citing *Deans v. CSX Transportation, Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). This court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

When faced with cross-motions for summary judgment, "the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). In doing so, it must "take care to 'resolve all factual disputes and any competing, rational

16

inferences in the light most favorable' to the party opposing that motion." *Id.* (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

According to Federal Rule of Civil Procedure Rule 56(g), "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."

The Declaratory Judgment Act requires a genuine, justiciable controversy for a declaratory judgment action to proceed. *See Brooks v. Cousins*, 527 F.2d 472, 473 (1975) ("[T]he parties must have adverse interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (quotation marks omitted))). Here, the parties' motions for partial summary judgment concern requests for declaratory judgment. If a party is entitled to a declaration, the court must issue one regardless of which side prevails and even if it is adverse to the party requesting it. *See Maryland Physician's Edge, LLC v. Behram*, 17-cv-2756-DKC, 2019 WL 4573417, at *9 (D.Md. Sept. 20, 2019). For a declaratory judgment to issue, there must be a dispute which "calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts." *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 242

17

(1937); *see also Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

**B. Cross-Motions for Summary Judgment on Count I of the Complaint and Count I of the Counterclaim**

Count I of the Complaint and Count I of the Counterclaim rest on whether Defendant was properly withdrawn from Future Field. Plaintiffs urge the court to grant summary judgment on Count I of the Complaint in their favor because the decision of Individual Plaintiffs to withdraw Defendant involuntarily is protected by the business judgment rule.  (ECF No. 55-1, at 24).  Alternatively, Plaintiffs contend that the Individual Plaintiffs "acted in accordance with the unambiguous and plain language of the Operating Agreement to involuntarily withdraw Defendant[.]"  (*Id.* at 24). Plaintiffs seek summary judgment on Count I of the Counterclaim on the same basis.  (*Id.* at 30).  Defendant counters that the business judgment rule does not apply to his involuntary withdrawal, which was not effectuated in accordance with the Operating Agreement. (ECF No. 68, at 8-11; *see also* ECF No. 80, at 6-10).

Defendant urges the court to grant summary judgment on Count I of the Complaint in his favor by reiterating that his involuntary withdrawal violated the terms of the Operating Agreement.  (*See* ECF No. 109-1, at 11-13).  Defendant seeks summary judgment on Count I of the Counterclaim on the same basis.  (*Id.* at 18). Plaintiffs contend otherwise and incorporate the arguments brought

in their motion for partial summary judgment in their response. (ECF No. 121, at 6-9).

### 1. Business Judgment Rule

Plaintiffs argue that the business judgment rule "insulate[s] [Individual Plaintiffs'] decision-making from judicial review[.]" (ECF No. 55-1, at 25).  Defendant counters that "[t]he business judgment rule applies to management decisions and not ownership decisions."  (ECF No. 68, at 10).

The business judgment rule provides that "decisions of [an] unincorporated organization are insulated from judicial review absent fraud, irregularity, or arbitrary action."  *N.A.A.C.P. v. Golding*, 342 Md. 663, 678 (1996).  "[I]f an organization acts inconsistently with its own rules, its action may be sufficiently arbitrary to invite judicial review."  *Id.* (citing *Developments in the Law: Judicial Control of Actions of Private Associations,* 76 Harv. L. Rev. 983, 1020–23 (1963)).  Given that the parties dispute whether Defendant was properly removed from Future Field pursuant to the terms of the Operating Agreement, judicial determination is appropriate to determine whether the Defendant's involuntary withdrawal is arbitrary.

Plaintiffs maintain that even the Operating Agreement protects Individual Plaintiffs from all liability arising from the exercise of their business judgment in Defendant's involuntary withdrawal.  (ECF No. 55-1, at 25).  In support, Plaintiffs point

to the following provision of the Operating Agreement (the "Liability Provision"):

> A Member or any employee will not be liable to [Future Field] or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or [Future Field]. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

(*Id.*) (quoting ECF No. 55-2, at 14).  Plaintiffs are incorrect. The Supreme Court of Maryland has explained that

> where . . . it is shown that the proceedings instituted against [an individual] have not been conducted in accordance with the prescribed rules of procedure . . . and that in violation of such rules he has been given no opportunity to appear and defend himself before the tribunal which is to hear and determine the charges preferred against him, the court, when called upon, will not hesitate to interfere in his behalf against the invasion of such rights.

*Most Worshipful United Grand Lodge of F. & A.M. of Maryland v. Lee*, 128 Md. 42, 49 (1916).  In other words, "the policy of minimizing judicial involvement in private organizations does not mean that members have no guarantee of procedural fairness." *Golding*, 342 Md. at 678.  For instance, "members in a private organization are entitled to at least rudimentary procedural protections, such as notice and an opportunity to be heard, before they may be expelled or deprived of other important membership rights."  *Id.* at 678-79 (citing *Evans v. Brown*, 134 Md. 519, 521-

20

22 (1919); *Smith v. Merriott*, 130 Md. 447, 451 (1917)).  "If the organization's adjudicatory procedure does not afford the member these minimal protections, or if the organization provides no avenue for internal review or appeal, then judicial intervention may be appropriate."  *Id.* at 679 (citing *Most Worshipful United Grand Lodge F. & A.M. v. Murphy*, 139 Md. 225, 233 (1921)).  Here, judicial intervention is appropriate because Defendant would otherwise lack any avenue for challenging his involuntary membership withdrawal, especially under Plaintiffs' expansive interpretation of the Liability Provision.  Therefore, the business judgment rule does not immunize Defendant's involuntary withdrawal from judicial review.

   **2. Operating Agreement**

   Plaintiffs argue that the Defendant was properly withdrawn from Future Field because (1) the Operating Agreement does not require unanimous consent from all members; and (2) a broad definition of "incompetence" applies, thus rendering a judicial determination unnecessary before withdrawal.  (ECF No. 55-1, at 26-30; *see also* ECF Nos. 90, at 5-8; 121, at 6-9).  Defendant, on the other hand, contends that he was improperly withdrawn from Future Field because (1) he did not receive notice of the Meeting in the form of a written document; (2) the Operating Agreement requires unanimous consent; and (3) a narrow definition of "incompetence" applies, thus rendering a judicial determination a

21

precondition to withdrawal.   (ECF No. 109-1, at 11-13, 18-19; *see also* ECF Nos. 68, at 8-9, 11-12; 80, at 8-10; 129, at 4-5).

Resolution of these issues involve the proper interpretation of the Operating Agreement, which is governed by contract law. *See Plank v. Cherneski*, 469 Md. 548, 570 (2020) ("The members' relationship with one another, the affairs of the LLC, and the conduct of the LLC's business are governed by contract, defined as an 'operating agreement.'").  Maryland law applies to the Operating Agreement because it expressly states that it is governed by Maryland law.   (ECF Nos. 55-2, at 4; 111-1, at 58).   "Courts in Maryland apply the law of objective contract interpretation, which provides that '[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding.'"   *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery. Co.*, 434 Md. 37, 51 (2013) (quoting *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368 (1958)).   A court must "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated."  *Id.* at 52 (quoting *General Motors Acceptance v. Daniels*, 303 Md. 254, 261 (1985)).   "In deciding whether a contract is ambiguous, the trial court must analyze the language of the contract, based on the plain meaning

22

of the language used." *Bollech v. Charles Cnty., Maryland*, 166 F.Supp.2d 443, 455 (D.Md. 2001) (quoting *Shapiro v. Massengill*, 105 Md.App. 743, 754 (1995)), *aff'd*, 69 F.App'x 178 (4th Cir. 2003). "Maryland courts also turn to the dictionary '"to supply contractual language with its ordinary and accepted meanings[.]"'" *Allegis Grp., Inc. v. Bero*, 689 F.Supp.3d 81, 118 (D.Md. 2023) (*W. F. Gebhardt & Co. v. Am. Eur. Ins. Co.*, 250 Md.App. 652, 668 (2021)). "If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." *Bollech*, 166 F.Supp.2d at 455 (quoting *World-Wide Rights Ltd. v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992)). "[A] contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Dumbarton*, 434 Md. at 52 (quoting *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167 (1964)). In other words, "courts do not interpret contracts in a manner that would render provisions superfluous or as having no effect." *Towson Univ. v. Conte*, 384 Md. 68, 81 (2004).

### a. Notice

Defendant argues that the Operating Agreement requires, and he did not receive reasonable written notice of the Meeting.  (*See* ECF Nos. 109-1, at 11; 80, at 7).   Plaintiffs counter that Defendant received sufficient notice of the Meeting given that he created the members' calendar entry for the Meeting, knew the Meeting was scheduled, and attended the Meeting.  (ECF No. 90, at 5 (citing ECF No. 90-1, at 8); *see also* ECF No. 121, at 7).

According to the Operating Agreement's provision governing meeting initiation procedures, "[a] meeting may be called by any Member providing that reasonable notice has been given to the other Members."  (ECF Nos. 55-2, at 7; 111-1, at 61).   The Operating Agreement's provision governing notice procedures provides that "[a]ny notices or delivery required . . . will be deemed completed when hand-delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the Members[.]"  (ECF Nos. 55-2, at 16; 111-1, at 70).  As a result, proper notice of the Meeting necessarily consists of delivery or mailing of a written document.[7]

---

[7] Defendant suggests that "reasonable notice" of the Meeting also requires advance notification that Defendant's involuntary withdrawal would be on the agenda at the Meeting. (ECF No. 80, at 7).  As Plaintiffs contend, however, "[t]here is no such content notice requirement, in the Operating Agreement or elsewhere, and Defendant offers no authority for the proposition that [Individual] Plaintiffs had any other independent duty to notify

Notice of the Meeting was indeed defective as it was provided by Mr. Reese via a Microsoft Teams message, (ECF No. 121-2, at 52), and by Defendant via a calendar reminder, (ECF No. 90-1, at 8). Nevertheless, defective notice for a members' meeting can be overcome via attendance at the meeting. *See First Mortg. Bond Homestead Ass'n v. Baker*, 157 Md. 309, 313-14 (1929) (holding that stockholders who attend a corporate meeting cannot complain of a lack of mailed notices because "those who actually attend a meeting have not ordinarily . . . any reason to complain of a lack of notice to bring them to it"); *Tompkins v. Sperry, Jones & Co.*, 96 Md. 560, 580 (1903) ("The presence of all the stockholders at the meeting . . . overcame any supposed difficulty from want or prior notice of the meeting, even though the statute prescribed the notice."). The record reflects, and the parties do not dispute, that Defendant attended the Meeting. (ECF No. 90-1, at 8). Thus, Defendant was not improperly withdrawn on the basis of defective notice for the Meeting—for which Defendant himself bears some responsibility.

### b. Unanimous Consent

Plaintiffs argue that unanimous consent, in the form of Defendant's vote and signature on the Amendment in favor of his own withdrawal, was not necessary to withdraw Defendant

---

[Defendant] that his involuntary withdrawal would be a subject of discussion at the [M]eeting." (ECF No. 121, at 7).

involuntarily because "[f]or a withdrawal to be 'involuntary[,]' it inherently requires the member being removed not to agree with the withdrawal[—]otherwise it would naturally be a voluntary withdrawal of a member" as governed by the Operating Agreement. (ECF No. 55-1, at 26; *see also* ECF Nos. 90, at 5-6; 121, at 8). Additionally, Plaintiffs contend that the Maryland Limited Liability Act (the "LLC Act") does not mandate unanimous consent of all members as a precondition to a member's involuntary withdrawal. (ECF No. 55-1, at 27) (first quoting Md. Code Ann., Corp. & Ass'n, § 4A-403(b)(2); and then citing Md. Code Ann., Corp. & Ass'n, § 4A-403(d)(2)). Defendant counters that "[t]he Operating Agreement['s] terms in other contexts always require a unanimous vote," suggesting that the same is required for an involuntary withdrawal of a member. (ECF Nos. 109-1, at 11; 80, at 7). Defendant also responds that the LLC Act does mandate unanimous consent of all members as a precondition to a member's involuntary withdrawal. (ECF No. 68, at 9) (citing Md. Code Ann., Corp. & Ass'n, §§ 4A-403(d)(2), 4A-404).

First, a reasonable reading of Operating Agreement supports the conclusion that involuntary withdrawal of a member does not require consent by all members. The Operating Agreement contains separate provisions governing the voluntary and involuntary withdrawal of a member (respectively, the "Voluntary Withdrawal Provision" and the "Involuntary Withdrawal Provision"). (ECF Nos.

26

55-2, at 8; 111-1, at 62) (containing distinct provisions titled "Voluntary Withdrawal of a Member" and "Involuntary Withdrawal of a Member"). Even though the Operating Agreement requires unanimous consent for withdrawal of contribution, admission of new members, dissolution, and amendment, (ECF Nos. 55-2, at 6, 8, 10, 15; 111-1, at 60, 62, 64, 69), Defendant's proposed interpretation of the Operating Agreement—such that Defendant must agree to his own involuntary withdrawal—would render the Voluntary Withdrawal Provision superfluous. More importantly, the plain meaning of the term "involuntary" suggests that involuntary withdrawal is necessarily contrary to Defendant's choice. *See Involuntary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/involuntary (last visited July 31, 2024) (defining "involuntary" as "done contrary to or without choice[,]" "compulsory[,]" or "not subject to control of the will"); *Involuntary*, Black's Law Dictionary (2$^d$ ed. 2024) ("An involuntary act is that which is performed with constraint . . . or with repugnance, or without the will to do it. An action is involuntary, then, which is performed under duress."). Interpreting the term "involuntary" pursuant to its plain meaning offers the only reasonable reading of the Operating Agreement that gives effect to both the Involuntary Withdrawal and Voluntary Withdrawal Provisions. Accordingly, Defendant's consent was not necessary for Individual Plaintiffs to withdraw him involuntarily as a member of Future Field.

27

Second, the LLC Act does not require all members' unanimous consent for a member's involuntary removal.  Section 4A-403(b)(2) plainly states that "[d]ecisions concerning the affairs of the [LLC] shall require the consent of members holding at least a majority of the interests in profits of the [LLC.]" Md. Code Ann., Corp. & Ass'n, § 4A-403(b)(2).  As Plaintiffs contend, the involuntary withdrawal of a member is not included in the LLC Act's list of actions members cannot take without the members' unanimous consent.  (ECF No. 55-1, at 27) (citing Md. Code Ann., Corp. & Ass'n, § 4A-403(d)(2)); *see* Md. Code Ann., Corp. & Ass'n, § 4A-403(d)(2) (listing actions by an LLC member that require the members' unanimous consent).  Given that Individual Plaintiffs together hold a majority interest in Future Field, they are entitled to withdraw Defendant as a member without his consent.

Although Section 4A-403(d)(2) of the LLC Act ("Section 4A-403(d)(2)") does not expressly mention involuntary withdrawal, Defendant insists that Section 4A-403(d)(2) impliedly encompasses involuntary withdrawal because his involuntary withdrawal "alter[ed] [his] allocation of profit and loss and manner of computing distributions."  (ECF No. 68, at 9).  Section 4A-403(d)(2) requires all members' consent for actions affecting the allocation of profit and loss, as well as the manner of computing distributions, to members of an LLC. Md. Code Ann., Corp. & Ass'n, § 4A-403(d)(2).  Here, Defendant overlooks the fact that the

28

involuntary withdrawal of a member is an action distinct from an alteration to profit and loss allocations and the distribution calculus—despite the former likely leading to the latter. Defendant's involuntary withdrawal is specifically a *membership* decision that is excluded from the scope of Section 4A-403(d)(2). Therefore, the LLC Act does not require Defendant to consent to his own involuntary withdrawal.[8]

### c. Definition of Incompetence

Ultimately, the definition of "incompetence" dispositively determines the propriety of Defendant's involuntary withdrawal. Plaintiffs argue that they properly withdrew Defendant involuntarily for behavior qualifying as "incompetence" under the Involuntary Withdrawal Provision, which should be broadly defined as "[t]he quality, state, or condition of being unable or unqualified to do something." (ECF No. 55-1, at 28 (citing *Incompetence*, Black's Law Dictionary (11th ed. 2019)); *see also* ECF Nos. 90, at 5 (citing *Incompetence*, Black's Law Dictionary (9th ed.

---

[8] The parties also dispute whether a vote took place at the Meeting, which is reflected in the parties' contrasting statements in the record. (*Compare* ECF No. 110-1 ¶ 51 (Defendant suggesting in his declaration that no vote occurred at the Meeting), *and* ECF No. 121-2, at 16 (Defendant testifying that "I do not recall a vote to remove me from [Future Field]."), *with* ECF No. 55-2 at 37 (Mr. Reese stating in his declaration that a vote occurred at the Meeting)). The parties' dispute regarding this issue, however, is immaterial. Regardless of whether a vote took place, as explained below, Defendant's involuntary withdrawal is invalid because Individual Plaintiffs withdrew Defendant on an improper basis.

2009); 121, at 8-9).   In contrast, Defendant contends that Plaintiffs improperly withdrew him for behavior that does not qualify as "incompetence," which should be narrowly defined as being physically or mentally incapable.[9]  (*See* ECF No. 80, at 8-9; *see also* ECF No. 109-1, at 11-12).   Rather, Defendant asserts that the behavior Plaintiffs allege as the basis for his involuntary withdrawal comprises other grounds for involuntary withdrawal that require a prior judicial determination: "wrongful conduct that adversely and materially affected [Future Field]'s business[;]" a "willful[] or persistent[] . . . breach of the [Operating] Agreement" or of "duties owed to [Future Field] or to the other Members[;]" and conduct that made "it not reasonably practicable to carry on the business with [Defendant]."  (ECF No. 80, at 8-9; *see also* ECF No. 109-1, at 11-12).

The first clause of the Involuntary Withdrawal Provision (the "First Clause") provides:

> Events leading to the involuntary withdrawal
> of a Member from [Future Field] will include
> but not be limited to: death of a Member;
> Member mental incapacity; Member disability
> preventing reasonable participation in

---

[9] In his opposition to Plaintiffs' motion for partial summary judgment, Defendant asserts that "the Court should not decide what 'Member incompetence' means as a matter of law." (ECF No. 68, at 9).  As explained below, the term "incompetence" in the context of the Operating Agreement is not ambiguous and may be interpreted by the court as a matter of law.  *See Bollech*, 166 F.Supp.2d at 455 (quoting *World-Wide Rights Ltd. v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992)).

> [Future Field]; Member incompetence; breach of fiduciary duties by a Member; criminal conviction of a Member; Operation of Law against a Member or a legal judgment against a Member that can reasonably be expected to bring the business or societal reputation of [Future Field] into disrepute.

(ECF Nos. 55-2, at 8; 111-1, at 62).  The second clause of the Involuntary Withdrawal Provision (the "Second Clause") offers an alternative avenue for a member's involuntary withdrawal:

> Expulsion of a Member can also occur on application by [Future Field] or another Member, where it has been judicially determined that the Member: has engaged in wrongful conduct that adversely and materially affected [Future Field]'s business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to [Future Field] or to the other Members; or has engaged in conduct relating to [Future Field]'s business that makes it not reasonably practicable to carry on the business with the Member.

(ECF Nos. 55-2, at 8; 111-1, at 62).  "Incompetence" is not defined elsewhere in the Operating Agreement.

Dictionaries have presented slightly varying definitions of incompetence.  Black's Law Dictionary defines an "incompetent" person as someone who is "incapable, inefficient and without the qualities needed to discharge their obligations and duties." *Incompetent*, Black's Law Dictionary (2d ed. 2024).  Merriam-Webster defines "incompetent" as: (1) "lacking the qualities needed for effective action"; (2) "unable to function properly"; (3) "not

31

legally qualified"; and (4) "inadequate to or unsuitable for a particular purpose[.]"   *See Incompetent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/incompetent (last visited July 31, 2024).  Given that the First Clause lists "incompetence" in a series, two canons of construction inform determination of the plain meaning of "incompetence" within the context of the Operating Agreement.  Under the related principles of *noscitur a sociis* and *ejusdem generis*, "the meaning of a word is or may be known from the accompanying words so that, under the rules, general and specific words, capable of analogous meaning, when associated together, take color from each other, so that general words are restricted to a sense analogous to less general." *LeRoy v. Kirk*, 262 Md. 276, 283 (1971).  "[W]hen a general word follows a series of specific words, the specific words restrict the general."  *Nautilus Ins. Co. v. BSA Ltd. P'ship*, 602 F.Supp.2d 641, 652 (D.Md. 2009); *accord Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001))).

In the First Clause, "incompetence" is preceded by terms such as "death[,]" "mental incapacity[,]" and "disability[,]" all of

which suggest a physical or mental incapability that is entirely outside of free will. As a result, the definition of "incompetence" must be constrained to something akin to those preceding terms.[10] Defendant's involuntary withdrawal would be proper if the reason for his withdrawal was that Defendant *could not* perform his job—not that Defendant *would not* perform his job according to Individual Plaintiffs' expectations.

Here, however, it is undisputed that Individual Plaintiffs deemed Defendant "incompetent" under the Operating Agreement on the basis of poor performance rather than an inability to perform. For instance, Mr. Reese alleges in his declaration that "Defendant failed to adhere to federal contracting rules, regulations, and laws[.]" (ECF Nos. 55-2, at 25; 121-2, at 37). Mr. Reese asserts that

> Defendant's misconduct included . . . lying to [Future Field]'s customers and his fellow members[;] obstructing [Future Field]'s efforts to obtain a required security facilities clearance[;] failing to obtain security compliance training[;]
>
> . . .
>
> mismanagement of [Future Field]'s finances, employee payroll, and employee benefits, which resulted in [Future Field] and at least one employee having to make amended tax filings to the Internal Revenue Service[]; poor

---

[10] The previous discussion regarding the Involuntary Withdrawal Provision as not requiring unanimity lends further support for this definition of "incompetence." A mentally incapable person cannot consent to his or her own withdrawal.

> performance on customer contracts culminating in a significant customer removing Defendant as technical lead; and unprofessional behavior towards several employees and inappropriate, threatening behavior towards at least one of [Future Field]'s employees.

(ECF Nos. 55-2, at 25, 30; 121-2, at 42; *see also, e.g.*, ECF Nos. 55-2, at 40-41 (email exchange where Mr. Reese identified problems with Defendant's performance); 55-2, at 45-53 (a series of messages where Mr. Reese admonished Defendant for making a misrepresentation to an employee)).[11] Mr. Reese also contends in his deposition that Defendant "disclosed private information of [Future Field] to third parties" and "exhibited impulsive behavior[.]" (ECF No. 111-1, at 37). Mr. Brent states in his deposition that Defendant did not "keep [a] promise" to avoid "bother[ing]" a Future Field employee who complained that Defendant's behavior towards him created a "hostile work environment[.]" (ECF Nos. 80-3, at 8; 111-1, at 53). Mr. Brent further describes instances where Future Field incurred monetary losses due to Defendant's mistakes in accounting and reporting hours worked. (ECF No. 123, at 5-6). Plaintiffs do not contend, and the record does not show, that Defendant was physically or mentally incapable of performing his job. Rather, the instances

---

[11] While Defendant disputes Mr. Reese's characterization of his work performance, he does not contest that such characterizations constituted Individual Plaintiffs' justification for his involuntary withdrawal. (*See* ECF Nos. 110-1; 111-1, at 14-24; 68-1).

of "incompetence" underlying Defendant's involuntary withdrawal merely reflect that Individual Plaintiffs did not like *the way* Defendant performed his job.   Thus, Defendant was improperly withdrawn from Future Field because the justifications provided for his involuntary withdrawal do not constitute "incompetence" under the terms of the Operating Agreement.

Plaintiffs insist that because the First Clause contains "no actual restriction on the reasons why a member can be involuntarily withdrawn from [Future Field,]" Defendant's involuntary withdrawal was proper regardless of the stated justification.   (*See* ECF No. 90, at 7-8).   Indeed, the First Clause expressly states that the reasons       for       involuntary       withdrawal       are "not . . . limited to" the articulated bases.   (*Id.* at 7) (quoting ECF No. 55-2, at 8).   Individual Plaintiffs, however, withdrew Defendant solely on the basis of "incompetence."   (*See* ECF No. 111-1, at 36-37).   The court may not conjure, in hindsight, alternative grounds justifying Defendant's involuntary withdrawal merely because the First Clause is non-exhaustive.   Plaintiffs bear the onus of setting forth the appropriate basis for withdrawal *at the time of* Defendant's involuntary withdrawal.

Moreover, as Defendant contends, the poor job performance that Plaintiffs allege as the impetus for Defendant's involuntary withdrawal   better   constitutes   "conduct   relating   to   [Future Field]'s business that makes it not reasonably practicable to carry

35

on the business with [Defendant]"—conduct for which a judicial determination is required prior to involuntary withdrawal, pursuant to the Second Clause.  (ECF Nos. 55-2, at 8; 111-1, at 62).   Plaintiffs reply that the non-exhaustive First Clause encompasses the Second Clause, and "[t]he fact that a judicial determination *could also* provide a reason for involuntary withdrawal does not somehow *require* a judicial determination to occur before a member can be removed [on the grounds listed in the Second Clause].  It simply provides an alternate justification." (ECF No. 121, at 9; *see also* ECF No. 90, at 7-8).   Plaintiffs' broad interpretation of the First Clause, such that involuntary withdrawal on the grounds listed in the Second Clause can occur regardless of whether a prior judicial determination has been obtained, is unpersuasive because it essentially renders the Second Clause superfluous.   Therefore, Defendant's involuntary withdrawal was improper for the additional reason that Plaintiffs did not seek a judicial determination beforehand.

In conclusion, by virtue of his improper withdrawal, Defendant remains a member of Future Field.  Moreover, in light of the Operating Agreement's requirement that any amendment or modification of the Operating Agreement must be "in writing and signed by all Members" in order to be "valid and effective[,]" (ECF Nos. 55-2, at 15; 111-1, at 69), the Amendment is invalid because it does not contain Defendant's signature, (ECF No. 55-2,

36

at 20, 84; 111-1, at 74; 107-10, at 2).  Hence, Defendant's motion for partial summary judgment will be granted, and Plaintiff's motion for partial summary judgment will be denied, with respect to Count I of the Complaint and the portions of Count I of the Counterclaim relating to Defendant's membership in Future Field Solutions, LLC and the invalidity of the March 22, 2022 Amendment to the Operating Agreement.

### C. Defendant's Motion for Partial Summary Judgment

#### 1. Count II of the Complaint

In Count II of the Complaint, Plaintiffs request judicial dissolution of Future Field if the court determines that Defendant has been improperly withdrawn from the company.  (ECF No. 34 ¶ 130).   Defendant argues that because "[Defendant] was not properly removed and . . . it is admitted and not genuinely disputed that [Future Field] has ceased doing business, the Court should declare [Future Field] dissolved."  (ECF No. 109-1, at 13). Thus, the parties agree that dissolution is the proper course of action at present.  Defendant requests that "[he] and a receiver appointed to dissolve properly [Future Field] should be allowed to account for its property and distributions since March 18, 2022, including any unequal distributions to Individual Plaintiffs after March 18, 2022."  (*Id.*) (citing Md. Code Ann., Corps. & Ass'ns § 4A-903; *Wei v. Xu*, No. 21-cv-601-ELH, 2022 WL 1422926 (D.Md. May 4, 2022)).   Plaintiffs respond that "if the Court rules that

[Defendant] is still a member of [Future Field], . . . the Court [should] grant dissolution of Future Field[.]"  (ECF No. 121, at 10).

The Operating Agreement provides that dissolution of Future Field may occur either "by a unanimous vote of the Members" or "on the occurrence of events specified in the [LLC] Act."  (ECF Nos. 55-2, at 10; 111-1, at 64).[12]  Section 4A-903 of the LLC Act ("Section 4A-903") states that a court, "[o]n application by or on behalf of a member, . . . may decree the dissolution of the limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or the operating agreement."  Md. Code Ann., Corps. & Ass'ns § 4A-903.  Despite the lack of guidance in Maryland caselaw regarding the circumstances that would render it not reasonably practicable to carry on the business, *see Balsamo v. Zorzit*, No. 761, Sept. Term, 2017, 2018 WL 3359642, at *5 (Md.App. July 9, 2018), Maryland courts "frequently look[] to Delaware cases in search of widely-regarded corporate legal jurisprudence[,]" *MAS Assocs., LLC v. Korotki*, 465 Md. 457, 479 n.11 (2019) (citing *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 338 n.14 (2009)

---

[12] The parties' agreement with respect to Future Field's dissolution may be tantamount to a unanimous vote in favor of dissolution.  Nevertheless, as explained below, the parties have shown that it is not reasonably practicable to carry on the business of Future Field.

("This Court has noted the 'respect properly accorded Delaware decisions on corporate law' ordinarily in our jurisprudence."), *superseded by statute on other grounds as recognized in Eastland Food Corp. v. Mekhaya*, 486 Md. 1, 23 (2023)).

In interpreting Section 18-802 of Delaware Limited Liability Company Act ("Section 18-802"),[13] the Delaware Court of Chancery has described several factual circumstances "indicative of a lack of 'reasonable practicability'": "(1) the members' vote is deadlocked at the Board level; (2) the operating agreement gives no means of navigating around the deadlock; and (3) due to the financial condition of the company, there is effectively no business to operate." *Seokoh, Inc. v. Lard-PT, LLC*, No. 2020-cv-0613-JRS, 2021 WL 1197593, at *8 (Del.Ch. Mar. 30, 2021) (quoting *Fisk Ventures, LLC v. Segal*, No. 3017-CC, 2009 WL 73957, at *4 (Del.Ch. Jan. 13, 2009)). "None of these factors is 'individually dispositive; nor must they all exist for a court to find it no longer reasonably practicable for a business to continue operating.'" *Id.* (quoting *Fisk Ventures*, 2009 WL 73957, at *4). "While it is true . . . that judicial dissolution of an LLC is a 'limited remedy that th[e] court grants sparingly,' dissolution

_____

[13] Section 18-802, Delaware's equivalent of Maryland's Section 4A-903, provides, "[o]n application by or for a member or manager the Court of Chancery may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."  Del. Code Ann. tit. 6, § 18-802.

39

may be warranted even where an LLC is "technically functioning" and "financially stable" if the petitioner can demonstrate that the entity is otherwise stuck within a "residual, inertial status quo" that prevents it from "operating or from furthering its stated business purpose."  *Id.* (footnote omitted) (first quoting *In re Arrow Inv. Advisors, LLC*, No. 4091-VCS, 2009 WL 1101682, at *2 (Del.Ch. Apr. 23, 2009); and then quoting *Fisk Ventures*, 2009 WL 73957, at *4).  "[D]issolution is [also] warranted where 'the LLC's management has become so dysfunctional or its business purpose so thwarted that it is no longer practicable to operate the business[.']"  *Id.* (quoting *Fisk Ventures*, 2009 WL 73957, at *4).

While Defendant's minority interest in Future Field does not result in a voting deadlock, Future Field, despite being a government contracting company, has already ceased performing government contracts since 2022 because it remains unable to certify control over the GoDaddy Domain—a requirement for conducting business with the government.  (*See* ECF Nos. 121-2, at 66; 112-1, at 4).  More importantly, the futility of continued collaboration between Defendant and Individual Plaintiffs on behalf of Future Field, even if Future Field regained control over the GoDaddy Domain, is plainly apparent from the parties' dispute. (*See, e.g.*, ECF Nos. 123, at 4 (testimony by Mr. Tunson that Defendant intentionally harmed Future Field); 111-1, at 45 (testimony by Mr. Reese that Individual Plaintiffs considered

40

Defendant "incompetent and [that he] had to be removed as a member of [Future Field]")). Future Field's inert, non-performing status, as well as the dysfunction amongst its members, demonstrate that it is not reasonably practicable for Future Field to carry on its business and counsel in favor of dissolution. Accordingly, Defendant's motion for partial summary judgment will be granted with respect to Count II of the Complaint, and Plaintiffs' alternative request for dissolution will be granted.

While Defendant argues that he and a court-appointed receiver should manage Future Field's dissolution, (ECF No. 109-1, at 13), Plaintiffs contend that they should be the ones to do so, (ECF No. 121, at 10). Section 4A-904 of the LLC Act ("Section 4A-904") states that "[u]nless otherwise agreed, the remaining members of a limited liability company or, if the company has no remaining members, the personal representative, guardian, or other successor to the last remaining member of the company may wind up the affairs of the limited liability company." Md. Code Ann., Corps. & Ass'ns § 4A-904. The Operating Agreement does not designate the person responsible for winding up Future Field. Hence, pursuant to Section 4A-904, Defendant *and* Individual Plaintiffs will manage Future Field's dissolution.

Future Field will be wound up according to the Operating Agreement, which provides that "[u]pon Dissolution of [Future Field] and liquidating of [Future Field's] property, and after

41

payment of all selling costs and expenses, the liquidator will distribute [Future Field's] assets to the following groups according to the following order of priority:" (1) "in satisfaction of liabilities to creditors except [Future Field's] obligations to current Members;" (2) "in satisfaction of [Future Field's] debt obligations to current Members; and" (3) "to the Members based on Member financial interest, as set out in the Valuation of Interest [provision (the "Valuation of Interest Provision")] of this Agreement."   (ECF Nos. 55-2, at 10-11; 111-1, at 64-65).   The parties are directed to confer and handle any other matters related to dissolution by mutual agreement.   If the parties are unable to reach an agreement, they may call upon the court for the purpose of winding up Future Field's affairs consistent with this memorandum opinion and order.

## 2. Count II of the Counterclaim

In Count II of the Counterclaim, Defendant alleges that Individual Plaintiffs breached the Operating Agreement by failing to (1) obtain his signature on the Amendment; (2) inform him of their intent to effectuate his involuntary withdrawal; and (3) obtain an independent fair market valuation of [Future Field's] assets.   (ECF No. 133 ¶ 176).   Defendant argues that Individual Plaintiffs breached the contractual obligations of the Operating Agreement because (1) he did not receive notice in the form of a mailed or delivered written document informing him of the Meeting

42

and its specific purpose for effectuating his involuntary withdrawal; (2) Individual Plaintiffs did not obtain a judicial determination prior to effectuating his involuntary withdrawal; (3) he did not sign the Amendment; and (4) Individual Plaintiffs decreased the value of Defendant's membership interest by "having their own accountant perform a book valuation[.]"  (ECF No. 109-1, at 19-20).  Plaintiffs counter that Defendant's arguments fail because Defendant was properly withdrawn from Future Field, and there is no evidence that Plaintiffs misvalued Defendant's membership interest due to the ongoing valuation process.  (ECF No. 121, at 15).

"In a Maryland breach of contract case, those elements are 'contractual obligation, breach, and damages.'"  *Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020) (quoting *Kumar v. Dhanda*, 198 Md.App. 337, 345 (2011), *aff'd sub nom. Shailendra Kumar, P.A. v. Dhanda*, 426 Md. 185 (2012)).[14]  As explained above, the defective notice of the Meeting was cured by Defendant's attendance at the Meeting, and the Operating Agreement imposes no obligation to provide notice of specific meeting content.  Because Defendant was improperly withdrawn from Future

---

[14]  In his motion for partial summary judgment, Defendant misrepresents the elements of a breach of contract claim. Specifically, Defendant fails to include the damages element. (*See* ECF No. 109-1, at 19).

Field, the Amendment, which lacks Defendant's signature, is invalid and violative of the Operating Agreement.

The only harm Defendant asserts arises from the breach of the Operating Agreement's Valuation of Interest Provision, which provides that "[i]n the event of a dissociation or the dissolution of [Future Field], each Member will have an equal financial interest in [Future Field]" and "the value of [Future Field] will be based on the fair market value appraisal of all [Future Field] assets . . . conducted by an independent accounting firm agreed to by all Members." (ECF No. 55-2, at 10; 111-1, at 64). In support of his assertion that Plaintiffs had their own accountant rather than a mutually agreed, independent accountant determine the value of Defendant's membership interest, Defendant cites to paragraph 39 of his statement of undisputed facts. (ECF No. 109-1, at 20) (citing ECF No. 108-1 ¶ 39). Defendant's statement of undisputed facts, however, does not mention the alleged breach of the Valuation of Interest Provision. (*See* ECF No. 108-1). Nor does the record contain any evidence regarding the valuation of Defendant's membership interest.[15] Defendant has not provided sufficient evidence such that a reasonable jury could conclude

---

[15] Magistrate Judge Coulson, however, issued an order on November 14, 2023 stating that "the parties shall permit [Ron] Stramberg[, the neutral expert retained for this case,] to finalize his written report and analysis [on the value of Defendant's membership interest in Future Field] by January 29, 2024." (ECF No. 106, at 3).

that all elements of Defendant's breach of contract claim have been satisfied. Therefore, Defendant's motion for partial summary judgment will be denied with respect to Count II of the Counterclaim.

### 3. Counts III and IV of the Counterclaim

In Count III of the Counterclaim, Defendant alleges that Individual Defendants breached their fiduciary duties to (1) "act in the best interests of [Future Field], which includes an obligation not to terminate . . . [Defendant][] for personal reasons;" (2) avoid "plac[ing] their personal interests ahead of those of the [Future Field], which includes an obligation not to steal the retained earnings or net profits of other members;" (3) "operate the [Future Field] in accordance with the provisions of the Operating Agreement;" (4) "pay members and employees . . . in a manner consistent with applicable law;" (5) "make distributions to members in proportion to the members' ownership interests and/or pursuant to the terms of the Operating Agreement and/or pursuant to the terms they agreed relating to 65% of their billables;" (6) avoid "mak[ing] decisions regarding distributions solely for certain members' benefit to the detriment of others;" and (7) avoid "wast[ing] [Future Field]'s value, such as but not limited to failing to protect and secure existing and expected contracts[.]" (ECF No. 133 ¶ 182). In Count IV of the Counterclaim, Defendant alleges that Individual Plaintiffs breached their duty of loyalty

by (1) "running [Future Field] for their personal benefit instead of for the benefit of all of the members"; (2) "terminating the employment of . . . [Defendant][] so that they would have more leverage against him in buyout negotiations"; and (3) "threatening to liquidate [Future Field] if [Defendant] did not agree to sell his shares at a discount."  (*Id.* ¶¶ 188-90).  Defendant argues that Individual Plaintiffs[16] breached the duty of loyalty and fiduciary duty to him, arising from the Operating Agreement, by improperly withdrawing him and failing to ensure that Defendant's membership interest was properly valued pursuant to the Valuation of Interest Provision.  (ECF No. 109-1, at 20-21).  Plaintiffs reiterate that Defendant's arguments fail because Defendant was properly withdrawn from Future Field, and there is no evidence that Individual Plaintiffs misvalued Defendant's membership interest due to the ongoing valuation process.  (ECF No. 121, at 16-17).

A plaintiff advancing a claim for a breach of duty of loyalty or a breach of fiduciary duty must allege "(1) the existence of a fiduciary relationship, (2) a breach of duty owed by the fiduciary to the beneficiary, and (3) harm resulting from the breach."  *See*

---

[16] Defendant's arguments in relation to Counts III and IV of the Counterclaim alternate between referring to Individual Plaintiffs and all Plaintiffs, collectively.  It is unclear, however, how Future Field owes Defendant a duty of loyalty and fiduciary duty.

*Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 192 (1995). Individual Plaintiffs as managing and majority interest members in Future Field owe Defendant a fiduciary duty. *See Plank*, 469 Md. at 572 ("[M]anaging members of an LLC owe fiduciary duties to the LLC and the minority members arising under traditional common law agency principles."). Individual Plaintiffs breached their duty to Defendant by, as explained above, improperly withdrawing him in violation of the Operating Agreement. Like in Count II of the Counterclaim, however, Defendant has not satisfied the element of harm because the record does not contain any evidence regarding the valuation of Defendant's membership interest. Thus, Defendant's motion for partial summary judgment will be denied with respect to Counts III and IV of the Counterclaim.

### 4. Counts III and IV of the Complaint

In Count III of the Complaint, Plaintiffs allege that Defendant intentionally interfered with Future Field's contracts with GoDaddy, Amazon Web Services, and the Lockheed Martin Corporation ("Lockheed Martin") by preventing Individual Plaintiffs from accessing the GoDaddy and AWS Accounts, jeopardizing Future Field's operations, and causing the loss of Future Field's contract with Lockheed Martin. (ECF No. 34 ¶¶ 136-138, 147). Similarly, in Count IV of the Complaint, Plaintiffs allege that Defendant intentionally interfered with their business

relationship with GoDaddy and Amazon Web Services by preventing Individual Plaintiffs from accessing the GoDaddy and AWS Accounts. (*Id.* ¶¶ 153, 155, 158).  Defendant argues that Counts III and IV of the Complaint fail because (1) Plaintiffs have not provided the contract between Future Field and Lockheed Martin and shown that it has been terminated; and (2) "th[e] contracts [in relation to the GoDaddy and AWS Accounts] are registered solely in the name of [Defendant] personally and were owned by him long before 2020 and [Future Field] even existed."  (*See* ECF No. 109-1, at 14-15).[17] Plaintiffs counter that (1) Defendant himself admits the existence of a contract between Future Field and Lockheed Martin in his statement of undisputed facts, which has been terminated; and (2) there is a genuine dispute of material fact regarding the ownership of the GoDaddy and AWS Accounts, as shown in the parties'

---

[17] Defendant also suggests that the lack of an expert witness on damages dooms Counts III and IV of the Complaint.  (ECF No. 109-1, at 14-15).  "It is not essential to produce expert testimony on matters that ordinary jurors would be aware of 'as a matter of general knowledge.'"  *Access Limousine Serv., Inc. v. Serv. Ins. Agency, LLC*, No. 15-cv-3724-TDC, 2016 WL 6126267, at *7 (D.Md. Oct. 19, 2016) (citing *Babylon v. Scruton*, 215 Md. 299, 307 (1958)).  "If a jury may reasonably reach a decision without the help of an expert, a party's failure to produce expert testimony will not amount to a failure to meet the party's burden of proof." *Id.* (citing *Ross v. Hous. Auth. of Baltimore City*, 430 Md. 648, 669-70 (2013); *Virgil v. Kash N' Karry Serv. Corp.*, 61 Md.App. 23, 31 (1984)).  Here, the court is not persuaded that proving damages requires expert testimony, as the loss of a contract that may result from a company's inability to access its website-related accounts is within the general knowledge of an average juror.

conflicting expert reports.  (ECF No. 121, at 11-12) (citing ECF No. 108-1 ¶¶ 33-34, 48).

"Maryland recognizes the tort action for wrongful interference with contractual or business relationships in two general forms: 'inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships[.]'" *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 650 (1994) (quoting *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69 (1984)).  The elements of a claim for tortious interference with contractual relations consists of the following: "(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." *Sensormatic*, 455 F.Supp.2d at 426 (quoting *Fowler v. Printers II, Inc.*, 89 Md.App. 448, 466 (1991)). A plaintiff advancing a claim for tortious interference with business relationships must allege: "(1) intentional and willful acts (2) calculated to cause damage to a plaintiff's lawful business that are (3) done with the unlawful and malicious purpose to cause damage, and that (4) cause actual damage." *Spengler v. Sears, Roebuck & Co.*, 163 Md.App. 220, 245 (2005).  According to the Supreme Court of Maryland,

> [t]he principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation. The two types of actions differ in the limits on the right to interfere which will be recognized in either case. Thus, where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved.

*Natural Design*, 302 Md. at 69-70 (footnote omitted) (citing *Goldman v. Building Assn.*, 150 Md. 677, 682 (1926); *Sumwalt Co. v. Knickerbocker*, 114 Md. 403, 414-415 (1911)).

A copy of the contract between Future Field and Lockheed Martin is not necessary because Mr. Reese has testified to its existence, and his statements must be taken as true at this juncture. (*See* ECF Nos. 112-1, at 10; 129-1, at 5). Additionally, Defendant admits the existence of the contract in his statement of undisputed facts. (*See* ECF No. 108-1 ¶¶ 33, 48). Both Mr. Reese and Mr. Tunson, however, have testified that Future Field's contract with Lockheed Martin has not been terminated—only that Future Field ceased performance on those contracts. (*See* ECF Nos. 112-1, at 10; 129-1, at 5). Furthermore, Plaintiffs do not allege, nor does the record show, that Amazon Web Services or GoDaddy breached their respective contracts as a result of Defendant's

alleged interference.  Accordingly, Count III of the Complaint necessarily fails.

Determining whether Defendant interfered in *Future Field's* business relationships with GoDaddy and Amazon Web Services rests on whether Defendant or Future Field owns the GoDaddy and AWS Accounts.  While the parties' expert reports do not directly address the ownership of the GoDaddy Account,[18] they demonstrate a genuine dispute of material fact regarding the ownership of the AWS account.  Defendant's expert Mr. Steinberg asserts that the AWS Account was a personal account because it was always registered to Defendant, and was only temporarily used to host domain registration information.  (ECF No. 54, at 40).  Although Plaintiffs' expert Dr. Eric Cole ("Dr. Cole"), acknowledges that the AWS Account was created by Defendant, he insists that it is a company account because its registration name was updated, by Defendant, to Future Field immediately after Future Field's formation.  (ECF No. 115-1, at 15).  Neither does other evidence in the record establish ownership of the AWS Account.  While invoices for the AWS Account were billed to Defendant, they were billed to Defendant *on behalf of Future Field* beginning in 2020. (ECF Nos. 107-7, at 2; 121-2, at 19-30).

---

[18] Rather, the parties' expert reports address the ownership of the GoDaddy *Domain*.  (*See* ECF Nos. 54; 115-1).

Other evidence in the record also fails to demonstrate that the GoDaddy Account belongs to Defendant rather than Future Field. The record shows that Defendant registered the GoDaddy Account using his name but under the erik@futurefieldsolutions.com email address, ostensibly as an agent of a prior iteration of Future Field. (ECF No. 107-16, at 2). In addition, Mr. Brent has testified that Future Field paid for fees associated with the GoDaddy Account in 2020 through 2021. (ECF No. 123, at 2). Dr. Cole also states that Defendant gave administrative access to Mr. Reese and Mr. Brent. (ECF No. 115-1, at 11). When construing the record in favor of the non-moving Plaintiffs, a reasonable jury could find that the GoDaddy Account is business account belonging to Future Field. Hence, Defendant's motion for partial summary judgment will be granted with respect to Count III of the Complaint and denied with respect to Count IV of the Complaint.

## 5. Count V of the Complaint

In Count V of the Complaint, Plaintiffs allege that Defendant violated the CFAA

> by accessing a protected computer to intentionally interfere with and/or block, without permission or authorization, Plaintiffs' right to exercise control over and sole access to [Future Field]'s domain name "futurefieldsolutions.com" by changing the login credentials at the [Future Field]'s account with GoDaddy and/or Amazon Web Services without permission or authorization.

52

(ECF No. 34 ¶ 161) (citing ECF No. 34-1, at 197-205). Plaintiffs also allege that, "upon information and belief, [Defendant] copied and/or deleted [Future Field's] files without permission or authorization after he was involuntarily withdrawn from [Future Field] on March 18, 2022." (*Id.* ¶ 162). Plaintiffs assert that Defendant's violation of the CFAA caused Future Field to lose its contract with Lockheed Martin and prevented Future Field from controlling and securing its website and communication systems, leading to $1,500,000 in damages. (*Id.* ¶¶ 163-64).

The Fourth Circuit has stated that

> the CFAA renders liable a person who (1) "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," in violation of [18 U.S.C.] § 1030(a)(2)(C); (2) "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value," in violation of [18 U.S.C.] § 1030(a)(4); or (3) "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage[,] or . . . causes damage and loss," in violation of [18 U.S.C.] § 1030(a)(5)(B)-(C).

*WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 201 (4th Cir. 2012). "In the computing context, 'access' references the act of entering a computer 'system itself' or a particular 'part of a computer system,' such as files, folders, or databases." *Van Buren v. United States*, 593 U.S. 374, 388 (2021). "A CFAA

53

plaintiff must 'show that there are triable issues as to (i) whether a CFAA-qualifying "loss" aggregating at least $5,000 occurred, and (ii) whether this loss was "caused" by a CFAA violation.'" *Ground Zero Museum Workshop v. Wilson*, 813 F.Supp.2d 678, 693 (D.Md. 2011) (quoting *Global Policy Partners, LLC v. Yessin*, 686 F.Supp.2d 642, 646 (E.D.Va. 2010)).

Defendant argues that Count V of the Complaint fails because (1) "there is no genuine dispute of fact that [he] did not access a [Future Field] computer without authorization"; (2) "[he] owns the AWS and GoDaddy [A]ccounts and so was authorized to log into those accounts"; (3) "Plaintiffs have never identified these files that they contend were copied or deleted"; and (4) "Plaintiffs have no evidence or expert testimony that any purported unauthorized access by [Defendant] caused any actual damages." (ECF No. 109-1, at 16-17). Plaintiffs counter that (1) they "did not authorize [Defendant] to delete any Company files or documents or to make any changes to the [Future Field]'s [AWS and GoDaddy] [A]ccounts" (2) Defendant does not own the AWS and GoDaddy Accounts; (3) "[they] provided Defendant with an audit log and two spreadsheet summaries of the audit log evidencing and identifying the documents Defendant deleted and/or copied from [Future Field] without authorization"; and (4) they have produced evidence of damages. (ECF Nos. 121, at 13 (citing ECF No. 122 ¶¶ 30, 31, 33-35, 37-38, 40-41, 43, 47-48); ECF No. 122 ¶ 47).

Plaintiffs do not allege, nor do they explain, how Defendant accessed a protected *computer* by changing the login permissions to the AWS and GoDaddy Accounts.[19] *Cf. Sci. Specialties Serv., Inc. v. Grebow*, No. 20-CV-01967-LKG, 2022 WL 798700, at *6 (D.Md. Mar. 16, 2022) (dismissing a CFAA claim because "[Plaintiff] . . . fails to explain how the act of deactivating the Domains, which [Defendant] acknowledges doing, could have involved accessing its computers").  In addition, while the record shows that, after Defendant's involuntary removal, Mr. Reese only allowed Defendant access to Future Field's computer system "to download any documents [he] needed from the company information systems necessary for any dispute [he] may have[,]" (ECF No. 121-2, at 74), as explained above, Defendant was improperly withdrawn from Future Field.  As a result, Defendant was entitled to access Future Field's computer system as a member of Future Field, and regardless of whether he obtained information from Future Field's system for a prohibited purpose, his actions do not violate the CFAA.[20]  *See Van Buren*,

---

[19] Accordingly, whether Defendant owns the AWS and GoDaddy Accounts is immaterial to determining whether he has violated the CFAA.

[20] As a result, whether Plaintiffs have identified the specific files Defendant copied or deleted is also immaterial to determining whether Defendant has violated the CFAA.  In support of their contention that their counsel has already "identif[ied] the documents Defendant deleted and/or copied from [Future Field] without authorization[,]" Plaintiffs cite to documents with the assigned Bates numbers of FFS0029716-28.  These documents do not appear to be in the record.

141 S.Ct. at 1653 (agreeing that "if a person has access to information stored in a computer—e.*g.*, in 'Folder Y,' from which the person could permissibly pull information—then he does not violate the CFAA by obtaining such information, regardless of whether he pulled the information for a prohibited purpose. But if the information is instead located in prohibited "Folder X," to which the person lacks access, he violates the CFAA by obtaining such information").

In addition, the lack of evidence in the record showing that Future Field suffered damages greater than $5,000 dooms Count V of the Complaint. As explained above, Future Field's contract with Lockheed Martin has not been terminated. Moreover, Mr. Tunson admits in his deposition that he has not been able to calculate the financial loss arising from the cessation of performance on Future Field's contract with Lockheed Martin. The record contains no other proof of costs incurred or losses suffered from the jeopardization of Future Field's operations such that a reasonable jury can conclude that Defendant's alleged violation of the CFAA generated at least $5,000 in damages for Future Field. *See Ground Zero Museum Workshop*, 813 F.Supp.2d at 694 (granting summary judgment on a CFAA claim in favor of the defendant because, among other reasons, "Plaintiffs provide no additional proof of . . . payment, no itemization of the costs, nor any other facts from which one could determine" a precise measure of damages).

56

Therefore, Defendant's motion for partial summary judgment will be granted with respect to Count V of the Complaint.

### 6. Count VI of the Complaint

In Count VI of the Complaint, Plaintiffs seek a declaratory judgment that Future Field "owns and is entitled to exercise exclusive possession and control of" the following property, which remains in Defendant's possession:

- A series of computer hardware (the "Computer Hardware"): A Dell G7 17 – 7700 Laptop; a VisionTek VT2500 USB-C Docking Station; three ASUS TUF Gaming 2711 2K HDR Gaming Monitors (VG27 AQ); a Raspberry Pi Touchscreen Monitor; four CanKit Raspberry Pi 4 8 GB Extreme Kits–128 GB Edition; a Raspberry Pi Touchscreen Monitor, Upgraded; a KVM Switch 4 Ports, HDMI USB Selector; a Rybozen USB Switch Selector; a Logitech G533 Wireless Gaming Headset; Soundcore Life P3 Noise Cancelling Earbuds; and Logitech Z407 Bluetooth Computer Speakers
- The AWS Account
- A series of domain names: FutureFieldConsulting.com; FutureFieldConsulting.net; FutureFieldEngineering.com; FutureFieldEngineering.net (collectively, the "Other Domain Names") ; FFS.io; and the GoDaddy Domain Name.

(ECF No. 34 ¶ 64). Defendant argues that (1) he already returned the Computer Hardware and the FFS.io domain name, (*see* ECF Nos. 109-1, at 17 (citing ECF No. 122 ¶ 49); 122 ¶ 49 (listing property returned by Defendant to Future Field)); and (2) Future Field cannot demonstrate ownership of the AWS Account and GoDaddy Domain Name, (ECF No. 109-1, at 17). Plaintiffs respond that (1)

Defendant indeed returned the Computer Hardware in May 2023 and the FFS.io domain name in October 2023; and (2) there is a genuine dispute of fact with respect to whether Defendant or Future Field owns the AWS Account and GoDaddy Domain Name. (ECF Nos. 121, at 14; 122 ¶ 49).

As an initial matter, given that the parties no longer dispute that Defendant returned the Computer Hardware and the FFS.io domain name to Future Field, Defendant's motion for partial summary judgment on Count VI of the Complaint will be denied as moot with respect to that property. In addition, Defendant's motion for partial summary judgment on Count VI of the Complaint will be denied with respect to the Other Domain Names and the AWS Account because Defendant's memorandum in support for his motion for partial summary judgment does not mention the Other Domain Names and, as explained above, there is a genuine dispute of fact about the ownership of the AWS Account.

The parties' expert reports also reflect a genuine dispute of fact about the ownership of the GoDaddy Domain Name. In support of his conclusion that Defendant owns the GoDaddy Domain Name as his personal domain name, Mr. Steinberg contends that it is dispositive that Defendant remains the registrant of the GoDaddy Domain Name: "[T]he registration history shows that [Defendant] initially registered the [GoDaddy] [D]omain, establishing [him] as the domain's legal owner. Official records show that since then[,]

there have been no changes of ownership." (ECF No. 54, at 30). Mr. Steinberg insists that the fact that Defendant allowed Future Field to use the GoDaddy Domain has no bearing on the ownership of the GoDaddy Domain. (*Id.* at 31). Dr. Cole, on the other hand, concludes that Future Field owns the GoDaddy Domain Name on the basis that the GoDaddy Domain Name "was used solely by [Future Field] and continues to be used solely by [Future Field] today (in a limited capacity due to [Defendant]'s unauthorized control)[,]" thus "show[ing] that the [GoDaddy] [D]omain [N]ame . . . was transferred over to [Future Field] and became an asset of [Future Field]." (ECF No. 115-1, at 9-10). Dr. Cole maintains that

> Even if [Defendant] initially acquired the [GoDaddy] [D]omain [Name] using his own funds, the fact that [he] then allowed [Future Field] to use the [GoDaddy] [D]omain [N]ame for over 12 years shows conclusively that he no longer viewed it as a personal domain name, transferred it implicitly over to [Future Field] based on his actions, and instead viewed it as an asset of [Future Field].

(*Id.* at 10). Mr. Steinberg and Dr. Cole's conflicting statements preclude the court from determining the ownership of the GoDaddy Domain Name. Accordingly, Defendant's motion for partial summary judgment will be denied as moot with respect to the claims in Count VI of the Complaint relating to the Computer Hardware and the FFS.io domain name. Defendant's motion for partial summary judgment will be denied with respect to the claims in Count VI of

59

the Complaint relating to the Other Domain Names, the AWS Account, and the GoDaddy Domain Name.

### 7. Counts X and XIII of the Counterclaim

In Count X of the Counterclaim, Defendant alleges that Plaintiffs violated the SCA by "accessing, reading, copying, and forwarding to other individuals stored electronic communications from [Defendant]'s personal Google [A]ccount" without authorization.  (ECF No. 133 ¶¶ 234, 235, 238).  Similarly, in Count XIII of the Counterclaim, Defendant alleges that Plaintiffs invaded his privacy by

> intentionally intrud[ing] into [Defendant's] private and personal Google [A]ccount . . . holding more than ten years of private, confidential, privileged and sensitive communications, documents, photos and videos of [Defendant], and mined through his personal, private, privileged and sensitive emails and records, including communications with his attorneys, his spouse and his medical providers in order to support their improper "involuntary removal" of [Defendant] from [Future Field].

(*Id.* ¶ 251).

The Stored Communications Act prohibits "(1) intentionally access[ing] without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceed[ing] an authorization to access that facility; . . . and thereby obtain[ing] . . . a wire or electronic communication while it is in electronic storage in such system."  18 U.S.C. § 2701(a).

60

"Intrusion upon seclusion occurs where there is an 'intentional intrusion upon the solitude or seclusion of another or her private affairs or concerns that would be highly offensive to a reasonable person.'" *Neal v. United States*, 599 F.Supp.3d 270, 306 (D.Md. 2022).[21]

Defendant urges the court to grant summary judgment on Counts X and XIII of the Counterclaim in his favor because he did not authorize Plaintiffs to access and review the erik@futurefieldsolutions.com email account within his overarching Google Account, the contents of which were later produced in discovery. (*See* ECF No. 109-1, at 22-23, 24-25). Plaintiffs counter that "they never accessed any of Defendant's personal documents or information [via] his erik@futurefieldsolutions.com email account[,]" and the Google Account wholly belongs to Future Field. (ECF No. 121, at 18, 20) (citing ECF No. 122 ¶¶ 55-62).

The record reflects a genuine dispute of material fact regarding whether Plaintiffs accessed the erik@futurefieldsolutions.com email account—or even the overarching Google Account—during discovery. In his declaration, Defendant states that in November 2021, he moved all emails related

---

[21] Although Count XIII of the Counterclaim does not allege a particular type of invasion of privacy, Defendant states in his memorandum in support of his partial motion for summary judgment that Plaintiffs committed intrusion upon seclusion. (ECF No. 109-1, at 24).

to Future Field from the Google Account to Microsoft365 as part of Future Field's migration to Microsoft365 for managing office operations and communications.  (ECF No. 42-2 ¶ 14).  Defendant insists that he "did not transfer [his] archived Google email to Microsoft365[,]" and instead "maintained [his] archived personal email and other data in the original legacy Google account with a secure password."  (*Id.* ¶ 15).  Afterwards, Defendant asserts that he "revoked any permission to access the Google [Account] and [his] specific account information."  (*Id.* ¶ 14).

In contrast, Mr. Reese maintains in his declaration that Defendant never revoked other members' access to the Google Account, and both he and Defendant made full backup copies of the Google Account in February and March 2022.  (ECF No. 45-3 ¶¶ 25-28; *see also* ECF No. 125, at 3 (noting in February 2022 meeting minutes that backup copies of data in the Google Account will be created)).  Mr. Reese states that some of the documents produced during discovery "were extracted from [those] backups of [Defendant]'s personal information" stored on Microsoft365.  (ECF No. 45-3 ¶ 35).[22]  A reasonable jury could conclude on this record that, as opposed to accessing the Google Account during discovery,

---

[22] Plaintiffs note that they "produced an audit log showing the documents produced by Plaintiffs in discovery (VOL004) are located in a backup of the Google Workspace account that is stored in [Future Field]'s [Microsoft]365 account."  In support, they refer to documents with the assigned Bates numbers of FFS0011316-19, which are not in the record.

Plaintiffs produced Defendant's emails from a backup copy of all the content in the erik@futurefieldsolutions.com email account that was saved to Microsoft365.

Even if Plaintiffs indeed accessed the erik@futurefieldsolutions.com email account during discovery, another question of material fact remains as to the ownership of the overarching Google Account.  Defendant in his declaration states that the Google Account never became Future Fields's property even though he allowed Plaintiffs temporary permission to use it for conducting business on behalf of Future Field.  (ECF No. 42-2 ¶ 12-13).  In support of the conclusion that Defendant owns the Google Account, Mr. Steinberg asserts that the Google Account is

> [a]n external, personal account used by [Defendant] in part for purposes outside of the LLC's course of business, when that account was registered and paid for by [Defendant] both prior to the creation of [Future Field] and subsequent to its creation, including for the time period during which Plaintiffs[] usurped control, and that account was configured in a form clearly reflecting it as being personal to [Defendant] rather than a[] [Future Field] asset[.]

(ECF No. 54, at 47).  Mr. Reese, however, states in his declaration that "[Defendant] initially created [Future Field]'s Google [A]ccount for use by a prior iteration of [Future Field], and when the current iteration of [Future Field] was formed, the [Google] [A]ccount became property of the current [iteration of Future

Field] upon agreement of the members." (ECF No. 45-3 ¶ 13). A reasonable jury could conclude on this record that the Google Account is a business account belonging to Future Field as opposed to a personal account belonging to Defendant.

These disputes of material fact preclude summary judgment on Counts X and XIII of the Counterclaim. Hence, Defendant's motion for partial summary judgment will be denied with respect to those counts.

### 8. Count XII of the Counterclaim

In Count XII of the Counterclaim, Defendant alleges that "[Plaintiffs] unlawfully and tortiously converted [Defendant]'s personal property, specifically ten (10) plus years' worth of data contained in his Google [A]ccount." (*Id.* ¶ 248).

"A claim for conversion requires proof of the following elements: (1) the plaintiff's right to possess the disputed property, and (2) an intentional taking of that property by a person without authority or permission." *Travel Comm., Inc. v. Pan Am. World Airways, Inc.*, 91 Md.App. 123, 183 (1992). The tort applies to tangible property and, under limited circumstances, to intangible property rights that are merged or incorporated into a document. *UBS Financial Services, Inc. v. Thompson*, 217 Md.App. 500, 515 (2014) (citing *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 562 (1999)). Whether the tort applies to emails is uncertain. *See Simone v. VSL Pharmaceuticals, Inc.*, No. 15-cv-1356-TDC, 2017

64

WL 66323 at *9 (D.Md. January 5, 2017) (rejecting the argument that account and login information, passwords, and electronic mail are intangible property ineligible to support a conversion claim on the basis that no authority has been provided to support that proposition); *Skapinetz v. CoesterVMS.com, Inc.*, No. 17-cv-1098-PX, 2018 WL 805393, at *4 (D.Md. Feb. 9, 2018) ("Although email accounts and electronic communications are not tangible property in the traditional sense, many courts have recognized claims for conversion or trespass to chattels involving digital 'property.'" (citing *Ground Zero Museum Workshop*, 813 F.Supp.2d at 697; *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609, 618 (S.D.N.Y. 2003); *Am. Online, Inc. v. IMS*, 24 F.Supp.2d 548, 550 (E.D.Va. 1998))).

Defendant argues that Plaintiffs converted his personal property because they changed the login credentials required to access his erik@futurefieldsolutions.com email account. (ECF No. 109-1, at 24). Plaintiffs counter that Defendant has no ownership right over the contents in the erik@futurefieldsolutions.com email account as it is housed by the overarching Google Account, which wholly belongs to Future Field.[23] (ECF No. 121, at 19). Defendant

---

[23] Plaintiffs do not challenge Defendant's assertion that the contents of the Google Account qualify for protection under the tort of conversion.

replies that he owns the Google Account.  (*See* ECF No. 129, at 7).[24]

As explained above, a genuine dispute of material fact exists with respect to the ownership of the Google Account.  Therefore, Defendant's motion for partial summary judgment will be denied with respect to Count XII of the Counterclaim.

**9. Count XVIII of the Counterclaim**

In Count XVIII of the Counterclaim, Defendant seeks temporary, preliminary and permanent injunctive relief "restraining and enjoining [Plaintiffs] from accessing and/or using [Defendant]'s personal Google [A]ccount and the data contained therein and ordering [Plaintiffs] to return the Google [A]ccount to [Defendant] and the data contained therein[.]"  (ECF No. 133, at 58).  Relying on his arguments in his motion for preliminary injunction, Defendant contends that he is entitled to permanent injunctive relief in relation to the Google Account. (ECF No. 109-1, at 25) (citing ECF No. 42).  Plaintiffs counter

---

[24] The parties also dispute whether Defendant encrypted the emails in the erik@futurefieldsolutions.com email account. (*Compare* ECF No. 109-1, at 24 (Defendant's statement that "[he] registered, held, owned, and encrypted his own personal email and information at erik@futurefieldsolutions. com" (citing ECF No. 108-1 ¶¶ 56-57))), *and* ECF No. 129, at 7 (Defendant's statement that "Google encrypts emails by default"), *with* ECF No. 121, at 19 (Plaintiffs' statement that "there is no evidence that [Defendant] encrypted his email at erik@futurefieldsolutions.com")).  Whether those emails were encrypted, however, is immaterial to determining whether Plaintiffs converted Defendant's property.

that Defendant is not entitled to permanent injunctive relief, and incorporate their arguments from their opposition to Defendant's motion for preliminary injunction.  (ECF No. 121, at 20) (citing ECF No. 45).

> [a] plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

The Supreme Court has stated that

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  In a prior opinion, the court denied Defendant's motion for preliminary injunction on the basis that Defendant has failed to demonstrate a likelihood of irreparable harm because Magistrate Judge Coulson has ordered Plaintiffs "to provide Defendant with his personal information contained in the Google Account at the risk of potential sanctions if they 'improperly transfer or otherwise copy, print, publish, delete, move, destroy, alter, or withhold' that information[.]"  (ECF No. 131, at 15) (quoting ECF No. 98, at 7).  As a result, "the risk that Plaintiffs will 'mine' Defendant's personal information in the Google Account remains no more than mere speculation."  (*Id.*).  Similarly here, Defendant

67

has provided no evidence showing that he has *already* suffered irreparable harm.  Thus, Defendant's motion for partial summary judgment will be denied with respect to Count XVIII of the Counterclaim.

## IV.  Motion to Dismiss

Plaintiffs and PeriArchon move to dismiss Defendant's second amended counterclaim and third-party complaint for lack of standing.  (ECF No. 137-1).  Specifically, Plaintiffs contend that Defendant is not a member of Future Field, and therefore cannot assert an injury in fact.  (*Id.* at 7-9).  In support, Plaintiffs and PeriArchon "incorporate the facts, arguments, and exhibits" included in Plaintiffs' papers in relation to the parties' pending motions for partial summary judgment.  (*Id.* at 9).  Defendant counters that Plaintiff and PeriArchon's motion to dismiss is a duplicative motion seeking a determination on the merits.  (ECF No. 140, at 8).

According to the Fourth Circuit,

> "where the jurisdictional facts are intertwined with the facts central to the merits of the dispute," a presumption of truthfulness should attach to the plaintiff's allegations. *Id.* In that situation, the defendant has challenged not only the court's jurisdiction but also the existence of the plaintiff's cause of action. A trial court should then afford the plaintiff the procedural safeguards—such as discovery—that would apply were the plaintiff facing a direct attack on the merits.

68

*Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). "If a district court does not dismiss under Rule 12(b)(1), it is entitled to treat a Rule 12(b)(1) motion as a direct attack on the merits under Rule 56(c)." *Id.* at 193 n.6 (citing *Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc.*, 840 F.2d 236, 239 (4th Cir. 1988)).

Here, Plaintiffs and PeriArchon challenge Defendant's standing on the basis that the jurisdictional facts alleged in the second amended counterclaim and third-party complaint regarding Plaintiff's continued membership in Future Field are false. Especially given that Plaintiffs raise the same dispositive issue in the papers in relation to the parties' pending motions for partial summary judgment—namely, whether Defendant has been properly withdrawn from Future Field—the motion to dismiss is essentially intertwined with the facts central to the merits of the dispute. (*See* ECF No. 137-1, at 3, 9-10). When Plaintiffs and PeriArchon's motion to dismiss is construed as a motion for summary judgment, it is duplicative of Plaintiffs' earlier motion for summary judgment with respect to the issue of whether Defendant was properly withdrawn from Future Field. As explained above, Defendant has been improperly withdrawn from Future Field. Thus, the Plaintiffs and PeriArchon's joint motion to dismiss Defendant's second amended counterclaim and third-party complaint will be denied.

## V.   Conclusion

For the foregoing reasons, Plaintiffs' motion for partial summary judgment will be denied; Defendant's motion for partial summary judgment will be granted in part and denied in part; the motions to seal will be denied; and the joint motion to dismiss Defendant's second amended counterclaim and third-party complaint will be denied.  A separate order will follow.

               /s/
DEBORAH K. CHASANOW
United States District Judge

70